# UNITED STATES v. 12 200-FT. REELS OF SUPER 8MM. FILM ET AL. (PALADINI, CLAIMANT)

No. 70–2. Argued January 19, 1972—Reargued November 7, 1972—
Decided June 21, 1973

BURGER, C. J., delivered the opinion of the Court, in which WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post*, p. 130. BRENNAN, J., filed a dissenting opinion, in which STEWART and MARSHALL, JJ., joined, *post*, p. 138.

*Solicitor General Griswold* reargued the cause for the United States. With him on the brief were *Assistant Attorney General Wilson, Deputy Solicitor General Greenawalt,* and *Sidney M. Glazer.*

*Thomas H. Kuchel,* by invitation of the Court, 404 U. S. 813, reargued the cause as *amicus curiae* in support of the judgment below. With him on the brief were *Edward Weinberg, George Miron,* and *Ezra C. Levine.**

---

*Briefs of *amici curiae* urging affirmance were filed by *Melvin L. Wulf* and *Joel M. Gora* for the American Civil Liberties Union; by

Mr. Chief Justice Burger delivered the opinion of the Court.

We noted probable jurisdiction to review a summary decision of the United States District Court for the Central District of California holding that § 305(a) of the Tariff Act of 1930, 46 Stat. 688, as amended, 19 U. S. C. § 1305 (a) was "unconstitutional on its face" and dismissing a forfeiture action brought under that statute.[1] The statute provides in pertinent part:

"All persons are prohibited from importing into the United States from any foreign country . . . any obscene book, pamphlet, paper, writing, advertisement, circular, print, picture, drawing, or other representation, figure, or image on or of paper or other material, or any cast, instrument, or other article which is obscene or immoral . . . . No such articles whether imported separately or contained in packages with other goods entitled to entry, shall be admitted to entry; and all such articles and, unless it appears to the satisfaction of the appropriate customs officer that the obscene or other prohibited articles contained in the package were inclosed therein without the knowledge or consent of the importer, owner, agent, or consignee, the entire contents of the package in which such articles are contained, shall be subject to seizure and forfeiture as hereinafter provided . . . . *Provided further,* That the Secretary of the Treasury may, in his discretion, admit the so-called classics or books of recognized and established literary or scientific merit, but may,

---

*Joel Hirschhorn, Ralph J. Schwarz, Jr.,* and *Mel S. Friedman* for the First Amendment Lawyers' Assn.; and by *Harvey A. Silverglate* for Christopher W. Walker.

[1] The United States brought this direct appeal under 28 U. S. C. § 1252. See *Clark* v. *Gabriel,* 393 U. S. 256, 258 (1968).

in his discretion, admit such classics or books only when imported for noncommercial purposes."

On April 2, 1970, the claimant Paladini sought to carry movie films, color slides, photographs, and other printed and graphic material into the United States from Mexico. The materials were seized as being obscene by customs officers at a port of entry, Los Angeles Airport, and made the subject of a forfeiture action under 19 U. S. C. § 1305 (a). The District Court dismissed the Government's complaint, relying on the decision of a three-judge district court in *United States* v. *Thirty-seven Photographs,* 309 F. Supp. 36 (CD Cal. 1970), which we later reversed, 402 U. S. 363 (1971). That case concerned photographs concededly imported for commercial purposes. The narrow issue directly presented in this case, and not in *Thirty-seven Photographs,* is whether the United States may constitutionally prohibit importation of obscene material which the importer claims is for private, personal use and possession only.[2]

Import restrictions and searches of persons or packages at the national borders rest on different considerations and different rules of constitutional law from domestic regulations. The Constitution gives Congress broad, comprehensive powers "[t]o regulate Commerce with foreign Nations." Art. I, § 8, cl. 3. Historically such broad powers have been necessary to prevent smuggling and to prevent prohibited articles from entry. See *United States* v. *Thirty-seven Photographs,* 402 U. S., at 376–377

---

[2] On the day the complaint was dismissed, claimant filed an affidavit with the District Court stating that none of the seized materials "were imported by me for any commercial purpose but were intended to be used and possessed by me personally." In conjunction with the Government's motion to stay the order of dismissal, denied below but granted by MR. JUSTICE BRENNAN, the Government conceded it had no evidence to contradict claimant's affidavit and did not "contest the fact that this was a private importation."

(opinion of WHITE, J.); *Carroll* v. *United States,* 267 U. S. 132, 154 (1925); *Brolan* v. *United States,* 236 U. S. 216, 218 (1915); *Boyd* v. *United States,* 116 U. S. 616, 623–624 (1886); *Alexander* v. *United States,* 362 F. 2d 379, 382 (CA9), cert. denied, 385 U. S. 977 (1966). The plenary power of Congress to regulate imports is illustrated in a holding of this Court which sustained the validity of an Act of Congress prohibiting the importation of "any film or other pictorial representation of any prize fight . . . designed to be used or [that] may be used for purposes of public exhibition" [3] in view of "the complete power of Congress over foreign commerce and its authority to prohibit the introduction of foreign articles . . . . *Buttfield* v. *Stranahan,* 192 U. S. 470; *The Abby Dodge,* 223 U. S. 166, 176; *Brolan* v. *United States,* 236 U. S. 216." *Weber* v. *Freed,* 239 U. S. 325, 329 (1915).

Claimant relies on the First Amendment and our decision in *Stanley* v. *Georgia,* 394 U. S. 557 (1969). But it is now well established that obscene material is not protected by the First Amendment. *Roth* v. *United States,* 354 U. S. 476, 485 (1957), reaffirmed today in *Miller* v. *California, ante,* at 23. As we have noted in *United States* v. *Orito, post,* at 141–143, also decided today, *Stanley* depended, not on any First Amendment right to purchase or possess obscene materials, but on the right to privacy in the home. Three concurring Justices indicated that the case could have been disposed of on Fourth Amendment grounds without reference to the nature of the materials. *Stanley* v. *Georgia, supra,* at 569 (STEWART, J., joined by BRENNAN and WHITE, JJ., concurring).

In particular, claimant contends that, under *Stanley,* the right to possess obscene material in the privacy of

---

[3] Act of July 31, 1912, c. 263, § 1, 37 Stat. 241.

the home creates a right to acquire it or import it from another country. This overlooks the explicitly narrow and precisely delineated privacy right on which *Stanley* rests. That holding reflects no more than what Mr. Justice Harlan characterized as the law's "solicitude to protect the privacies of the life within [the home]." *Poe* v. *Ullman,* 367 U. S. 497, 551 (1961) (dissenting opinion).[4] The seductive plausibility of single steps in a chain of evolutionary development of a legal rule is often not perceived until a third, fourth, or fifth "logical" extension occurs. Each step, when taken, appeared a reasonable step in relation to that which preceded it, although the aggregate or end result is one that would never have been seriously considered in the first instance.[5] This kind of gestative propensity calls for the "line drawing" familiar in the judicial, as in the legislative process: "thus far but not beyond." Perspectives may change, but our conclusion is that *Stanley* represents such a line of demarcation; and it is not unreasonable to assume that had it not been so delineated, *Stanley* would not be the law today. See *United States* v. *Reidel,* 402 U. S. 351, 354–356 (1971); *id.,* at 357–360 (Harlan, J., concurring). See also *Miller* v. *United States,* 431 F. 2d 655, 657 (CA9 1970); *United States* v. *Fragus,* 428 F. 2d

---

[4] Nor can claimant rely on any other sphere of constitutionally protected privacy, such as that which encompasses the intimate medical problems of family, marriage, and motherhood. See *Paris Adult Theatre I* v. *Slaton, ante,* at 65–67, and *United States* v. *Orito, post,* at 142–143.

[5] Mr. Justice Holmes had this kind of situation in mind when he said:

"All rights tend to declare themselves absolute to their logical extreme. Yet all in fact are limited by the neighborhood of principles of policy which are other than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached." *Hudson County Water Co.* v. *McCarter,* 209 U. S. 349, 355 (1908).

1211, 1213 (CA5 1970); *United States* v. *Melvin,* 419 F.
2d 136, 139 (CA4 1969); *Gable* v. *Jenkins,* 309 F. Supp.
998, 1000–1001 (ND Ga. 1969), aff'd, 397 U. S. 592
(1970). Cf. *Karalexis* v. *Byrne,* 306 F. Supp. 1363, 1366
(Mass. 1969), vacated on other grounds, 401 U. S. 216
(1971).

We are not disposed to extend the precise, carefully
limited holding of *Stanley* to permit importation of
admittedly obscene material simply because it is im-
ported for private use only. To allow such a claim
would be not unlike compelling the Government to
permit importation of prohibited or controlled drugs
for private consumption as long as such drugs are not
for public distribution or sale. We have already indi-
cated that the protected right to possess obscene material
in the privacy of one's home does not give rise to a cor-
relative right to have someone sell or give it to others.
*United States* v. *Thirty-seven Photographs, supra,* at 376
(opinion of WHITE, J.), and *United States* v. *Reidel,*
*supra,* at 355. Nor is there any correlative right to
transport obscene material in interstate commerce.
*United States* v. *Orito, post,* at 142–144.[6] It follows that
*Stanley* does not permit one to go abroad and bring such
material into the country for private purposes. "*Stan-
ley's* emphasis was on the freedom of thought and mind
in the privacy of the home. But a port of entry is not

---

[6] In *Caminetti* v. *United States,* 242 U. S. 470 (1917), and *Hoke*
v. *United States,* 227 U. S. 308 (1913), this Court upheld the "so-
called White Slave Traffic Act, which was construed to punish any
person engaged in enticing a woman from one State to another for
immoral ends, *whether for commercial purposes or otherwise,* . . .
because it was intended to prevent the use of interstate commerce
to facilitate prostitution or concubinage, and other forms of im-
morality." *Brooks* v. *United States,* 267 U. S. 432, 437 (1925)
(emphasis added).

a traveler's home." *United States* v. *Thirty-seven Photographs, supra,* at 376 (opinion of WHITE, J.).

This is not to say that Congress could not allow an exemption for private use, with or without appropriate guarantees such as bonding, or permit the transportation of obscene material under conditions insuring privacy. But Congress has not seen fit to do so, and the holding in *Roth* v. *United States, supra,* read with the narrow holding of *Stanley* v. *Georgia, supra,* does not afford a basis for claimant's arguments. The Constitution does not compel, and Congress has not authorized, an exception for private use of obscene material. See *Paris Adult Theatre I* v. *Slaton, ante,* at 64–69; *United States* v. *Reidel, supra,* at 357; *Memoirs* v. *Massachusetts,* 383 U. S. 413, 462 (1966) (WHITE, J., dissenting).

The attack on the overbreadth of the statute is thus foreclosed, but, independently, we should note that it is extremely difficult to control the uses to which obscene material is put once it enters this country. Even single copies, represented to be for personal use, can be quickly and cheaply duplicated by modern technology thus facilitating wide-scale distribution. While it is true that a large volume of obscene material on microfilm could rather easily be smuggled into the United States by mail, or otherwise, and could be enlarged or reproduced for commercial purposes, Congress is not precluded from barring some avenues of illegal importation because avenues exist that are more difficult to regulate. See *American Power & Light Co.* v. *SEC,* 329 U. S. 90, 99–100 (1946).

As this case came to us on the District Court's summary dismissal of the forfeiture action, no determination of the obscenity of the materials involved has been made. We have today arrived at standards for testing the constitutionality of state legislation regulating obscenity.

See *Miller* v. *California, ante,* at 23–25. These standards are applicable to federal legislation.[7] The judgment of the District Court is vacated and the case is remanded for further proceedings consistent with this opinion, *Miller* v. *California, supra,* and *United States* v. *Orito, supra,* both decided today.

*Vacated and remanded.*

MR. JUSTICE DOUGLAS, dissenting.

I know of no constitutional way by which a book, tract, paper, postcard, or film may be made contraband because of its contents. The Constitution never purported to give the Federal Government censorship or oversight over literature or artistic productions, save as they might be governed by the Patent and Copyright Clause of Art. I, § 8, cl. 8, of the Constitution.[1] To be

---

[7] We further note that, while we must leave to state courts the construction of state legislation, we do have a duty to authoritatively construe federal statutes where " 'a serious doubt of constitutionality is raised' " and " 'a construction of the statute is fairly possible by which the question may be avoided.' " *United States* v. *Thirty-seven Photographs,* 402 U. S. 363, 369 (1971) (opinion of WHITE, J.), quoting from *Crowell* v. *Benson,* 285 U. S. 22, 62 (1932). If and when such a "serious doubt" is raised as to the vagueness of the words "obscene," "lewd," "lascivious," "filthy," "indecent," or "immoral" as used to describe regulated material in 19 U. S. C. § 1305 (a) and 18 U. S. C. § 1462, see *United States* v. *Orito, post,* at 140 n. 1, we are prepared to construe such terms as limiting regulated material to patently offensive representations or descriptions of that specific "hard core" sexual conduct given as examples in *Miller* v. *California, ante,* at 25. See *United States* v. *Thirty-seven Photographs, supra,* at 369–374 (opinion of WHITE, J.). Of course, Congress could always define other specific "hard core" conduct.

[1] Even the copyright power is limited by the freedoms secured by the First Amendment. *Lee* v. *Runge,* 404 U. S. 887, 892–893 (DOUGLAS, J., dissenting); Nimmer, Does Copyright Abridge the First Amendment Guarantees of Free Speech and Press?, 17 U. C. L. A. L. Rev. 1180 (1970).

sure, the Colonies had enacted statutes which limited the freedom of speech, see *Roth* v. *United States,* 354 U. S. 476, 482–484, nn. 10–13, and in the early 19th century the States punished obscene libel as a common-law crime. *Knowles* v. *State,* 3 Day 103 (Conn. 1808) (signs depicting "monster"); *Commonwealth* v. *Holmes,* 17 Mass. 336 (1821) (John Cleland's Memoirs of a Woman of Pleasure); *State* v. *Appling,* 25 Mo. 315, 316 (1857) (utterance of words "too vulgar to be inserted in this opinion"); *Commonwealth* v. *Sharpless,* 2 S. & R. 91, 92 (1815) ("lewd, wicked, scandalous, infamous, . . . and indecent posture with a woman").

To construe this history, as this Court does today in *Miller* v. *California, ante,* p. 15, as qualifying the plain import of the First Amendment is both a *non sequitur* and a disregard of the Tenth Amendment.

"[W]hatever may [have been] the form which the several States . . . adopted in making declarations in favor of particular rights," James Madison, the author of the First Amendment, tells us, "the great object in view [was] to limit and qualify the powers of [the Federal] Government, by excepting out of the grant of power those cases in which the Government ought not to act, or to act only in a particular mode." 1 Annals of Cong. 437. Surely no one should argue that the retention by the States of vestiges of established religions after the enactment of the Establishment and Free Exercise Clauses saps these clauses of their meaning.[2] Yet it was precisely upon such reasoning that this Court, in *Roth,* exempted the bawdry from the protection of the First Amendment.

---

[2] Thus, the suggestion that most of the States that had ratified the Constitution punished blasphemy or profanity, is irrelevant to our inquiry here.

When it was enacted, the Bill of Rights applied only to the Federal Government, *Barron* v. *Mayor of Baltimore,* 7 Pet. 243, and the Tenth Amendment reserved the residuum of power to the States and the people. That the States, at some later date, may have exercised this reserved power in the form of laws restricting expression in no wise detracts from the express prohibition of the First Amendment. Only when the Fourteenth Amendment was passed did it become even possible to argue that through it the First Amendment became applicable to the States. But that goal was not attained until the ruling of this Court in 1931 that the reach of the Fourteenth Amendment included the First Amendment. See *Stromberg* v. *California,* 283 U. S. 359, 368.

At the very beginning, however, the First Amendment applied only to the Federal Government and there is not the slightest evidence that the Framers intended to put the newly created federal regime into the role of ombudsman over literature. Tying censorship to the movement of literature or films in interstate commerce or into foreign commerce would have been an easy way for a government of delegated powers to impair the liberty of expression. It was to bar such suppression that we have the First Amendment. I dare say Jefferson and Madison would be appalled at what the Court espouses today.

The First Amendment was the product of a robust, not a prudish, age. The four decades prior to its enactment "saw the publication, virtually without molestation from any authority, of two classics of pornographic literature." D. Loth, The Erotic in Literature 108 (1961). In addition to William King's The Toast, there was John Cleland's Memoirs of a Woman of Pleasure which has been described as the "most important work of genuine pornography that has been published in English . . . ." L. Markun, Mrs. Grundy 191 (1930). In England, Harris' List of Covent Garden Ladies, a catalog

used by prostitutes to advertise their trade, enjoyed open circulation. N. St. John-Stevas, Obscenity and the Law 25 (1956). Bibliographies of pornographic literature list countless erotic works which were published in this time. See, *e. g.,* A. Craig, Suppressed Books (1963); P. Fraxi, Catena Librorum Tacendorum (1885); W. Gallichan, The Poison of Prudery (1929); D. Loth, *supra;* L. Markun, *supra.* This was the age when Benjamin Franklin wrote his "Advice to a Young Man on Choosing a Mistress" and "A Letter to the Royal Academy at Brussels." "When the United States became a nation, none of the fathers of the country were any more concerned than Franklin with the question of pornography. John Quincy Adams had a strongly puritanical bent for a man of his literary interests, and even he wrote of Tom Jones that it was 'one of the best novels in the language.'" Loth, *supra,* at 120. It was in this milieu that Madison admonished against any "distinction between the freedom and licentiousness of the press." S. Padover, The Complete Madison 295 (1953). The Anthony Comstocks, the Thomas Bowdlers and Victorian hypocrisy—the predecessors of our present obscenity laws—had yet to come upon the stage.[3]

---

[3] Separating the worthwhile from the worthless has largely been a matter of individual taste because significant governmental sanctions against obscene literature are of relatively recent vintage, not having developed until the Victorian Age of the mid-19th century. N. St. John-Stevas, Obscenity and the Law 1–85 (1956). See T. Emerson, The System of Freedom of Expression 468–469 (1970); J. Paul & M. Schwartz, Federal Censorship, c. 1 (1961); Report of the Commission on Obscenity and Pornography 349–354 (1970). In this country, the first federal prohibition on obscenity was not until the Tariff Act of 1842, c. 270, § 28, 5 Stat. 566. England, which gave us the infamous Star Chamber and a history of licensing of publishing, did not raise a statutory bar to the importation of obscenity until 1853, Customs Consolidation Act, 16 & 17 Vict., c. 107, and waited until 1857 to enact a statute which banned obscene literature outright. Lord Campbell's Act, 20 & 21 Vict., c. 83.

Julius Goebel, our leading expert on colonial law, does not so much as allude to punishment of obscenity.[4]  J. Goebel, Development of Legal Institutions (1946); J. Goebel, Felony and Misdemeanor (1937); J. Goebel & T. Naughton, Law Enforcement in Colonial New York (1944).

Nor is there any basis in the legal history antedating the First Amendment for the creation of an obscenity exception. *Memoirs* v. *Massachusetts*, 383 U. S. 413, 424 (DOUGLAS, J., concurring).  The first reported case involving obscene conduct was not until 1663.  There, the defendant was fined for "shewing himself naked in a balkony, and throwing down bottles (pist in) vi & armis among the people in Convent Garden, contra pacem, and to the scandal of the Government." *Sir Charles Sydlyes Case*, 83 Eng. Rep. 1146–1147 (K. B. 1663). Rather than being a fountainhead for a body of law proscribing obscene literature, later courts viewed this case simply as an instance of assault, criminal breach of the peace, or indecent exposure. *E. g., Bradlaugh* v. *Queen*, L. R. 3 Q. B. 569, 634 (1878); *Rex* v. *Curl*, 93 Eng. Rep. 849, 851 (K. B. 1727) (Fortescue, J., dissenting).

The advent of the printing press spurred censorship in England, but the ribald and the obscene were not, at first, within the scope of that which was officially banned. The censorship of the Star Chamber and the licensing of

---

[4] The only colonial statute mentioning the word "obscene" was Acts and Laws of the Province of Mass. Bay, c. CV, § 8 (1712), in Mass. Bay Colony Charter & Laws 399 (1814).  It did so, however, in the context of "composing, writing, printing or publishing . . . any filthy, obscene, or profane song, pamphlet, libel or mock sermon, in imitation or in mimicking of preaching, or any other part of divine worship" and must, therefore, be placed with the other colonial blasphemy laws. *E. g.*, An Act for the Punishment of divers capital and other Felonies, Conn. Acts, Laws, Charter & Articles of Confederation 66, 67 (1784); Act of 1723, c. 16, § 1, Digest of the Laws of Md. 92 (Herty 1799).

books under the Tudors and Stuarts was aimed at the blasphemous or heretical, the seditious or treasonous. At that date, the government made no effort to prohibit the dissemination of obscenity. Rather, obscene literature was considered to raise a moral question properly cognizable only by ecclesiastical, and not the common-law, courts.[5] "A crime that shakes religion (a), as profaneness on the stage, &c. is indictable (b); but writing an obscene book, as that intitled, 'The Fifteen Plagues of a Maidenhead,' is not indictable, but punishable only in the Spiritual Court (c)." *Queen* v. *Read,* 88 Eng. Rep. 953 (K. B. 1707). To be sure, *Read* was ultimately overruled and the crime of obscene libel established. *Rex* v. *Curl, supra.* It is noteworthy, however, that the only reported cases of obscene libel involved politically unpopular defendants. *Ibid.; Rex* v. *Wilkes,* 98 Eng. Rep. 327 (K. B. 1770).

In any event, what we said in *Bridges* v. *California,* 314 U. S. 252, 264–265, would dispose of any argument that earlier restrictions on free expression should be read into the First Amendment:

"[T]o assume that English common law in this field became ours is to deny the generally accepted historical belief that 'one of the objects of the Revolution was to get rid of the English common law on liberty of speech and of the press.' . . .

"More specifically, it is to forget the environment in which the First Amendment was ratified. In presenting the proposals which were later embodied in the Bill of Rights, James Madison, the leader in the preparation of the First Amendment, said: 'Although I know whenever the great rights, the trial by jury, freedom of the press, or liberty of conscience,

---

[5] Lord Coke's De Libellis Famosis, 77 Eng. Rep. 250 (1605), for example, was the definitive statement of the common law of libel but made no mention of the misdemeanor of obscene libel.

come in question in that body [Parliament], the invasion of them is resisted by able advocates, yet their Magna Charta does not contain any one provision for the security of those rights, respecting which the people of America are most alarmed. The freedom of the press and rights of conscience, those choicest privileges of the people, are unguarded in the British Constitution.' "

This Court has nonetheless engrafted an exception upon the clear meaning of words written in the 18th century. But see *ibid.*; *Grosjean* v. *American Press Co.*, 297 U. S. 233, 249.

Our efforts to define obscenity have not been productive of meaningful standards. What is "obscene" is highly subjective, varying from judge to judge, from juryman to juryman.

"The fireside banter of Chaucer's Canterbury Pilgrims was disgusting obscenity to Victorian-type moralists whose co-ed granddaughters shock the Victorian-type moralists of today. Words that are obscene in England have not a hint of impropriety in the United States, and *vice versa*. The English language is full of innocent words and phrases with obscene ancestry." I. Brant, The Bill of Rights 490 (1965).

So speaks our leading First Amendment historian; and he went on to say that this Court's decisions "seemed to multiply standards instead of creating one." *Id.*, at 491. The reason is not the inability or mediocrity of judges.

"What is the reason for this multiple sclerosis of the judicial faculty? It is due to the fact stated above, that obscenity is a matter of taste and social custom, not of fact." *Id.*, at 491–492.

Taste and custom are part of it; but, as I have said on other occasions,[6] the neuroses of judges, lawmakers, and of the so-called "experts" who have taken the place of Anthony Comstock, also play a major role.

Finally, it is ironic to me that in this Nation many pages must be written and many hours spent to explain why a person who can read whatever he desires, *Stanley* v. *Georgia,* 394 U. S. 557, may not without violating a law carry that literature in his briefcase or bring it home from abroad. Unless there is that ancillary right, one's *Stanley* rights could be realized, as has been suggested, only if one wrote or designed a tract in his attic and printed or processed it in his basement, so as to be able to read it in his study. *United States* v. *Thirty-seven Photographs,* 402 U. S. 363, 382 (Black, J., dissenting).

Most of the items that come this way denounced as "obscene" are in my view trash. I would find few, if any, that had by my standards any redeeming social value. But what may be trash to me may be prized by others.[7] Moreover, by what right under the Constitution do five of us have to impose our set of values on the literature of the day? There is danger in that course, the danger of bending the popular mind to new norms of conformity. There is, of course, also danger in tolerance, for tolerance often leads to robust or even ribald productions. Yet that is part of the risk of the First Amendment.

Irving Brant summed the matter up:

"Blessed with a form of government that requires universal liberty of thought and expression, blessed with a social and economic system built on that

---

[6] *Ginsberg* v. *New York,* 390 U. S. 629, 655–656, 661–671 (DOUGLAS, J., dissenting).

[7] *Ginzburg* v. *United States,* 383 U. S. 463, 491 (DOUGLAS, J., dissenting).

138

same foundation, the American people have created the danger they fear by denying to themselves the liberties they cherish." Brant, *supra*, at 493.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE STEWART and MR. JUSTICE MARSHALL join, dissenting.

We noted probable jurisdiction to consider the constitutionality of 19 U. S. C. § 1305(a), which prohibits all persons from "importing into the United States from any foreign country . . . any obscene book, pamphlet, paper, writing, advertisement, circular, print, picture, drawing, or other representation, figure, or image on or of paper or other material, or any cast, instrument, or other article which is obscene or immoral." Pursuant to that provision, customs authorities at Los Angeles seized certain movie films, color slides, photographs, and other materials, which claimant sought to import into the United States. A complaint was filed in the United States District Court for the Central District of California for forfeiture of these items as obscene. Relying on the decision in *United States* v. *Thirty-seven Photographs,* 309 F. Supp. 36 (CD Cal. 1969), which held the statute unconstitutional on its face, the District Court dismissed the complaint. Although we subsequently reversed the decision in *United States* v. *Thirty-seven Photographs,* 402 U. S. 363 (1971), the reasoning that led us to uphold the statute is no longer viable, under the view expressed in my dissent today in *Paris Adult Theatre I* v. *Slaton, ante,* p. 73. Whatever the extent of the Federal Government's power to bar the distribution of allegedly obscene material to juveniles or the offensive exposure of such material to unconsenting adults, the statute before us is, in my view, clearly overbroad and unconstitutional on its face. See my dissent in *Miller* v. *California, ante,* at 47. I would therefore affirm the judgment of the District Court.