JERRY LEON GIBBS *v.* STATE OF ARKANSAS

73-159                                          504 S.W. 2d 719

Opinion delivered February 4, 1974

*Robert D. Ridgeway,* for appellant.

*Jim Guy Tucker,* Atty. Gen., by: *Philip M. Wilson,* Asst. Atty. Gen., for appellee.

*John Wesley Hall Jr.,* for *Lee Munson,* Pros. Atty., 6th Judicial Circuit, *Amicus Curiae.*

JOHN A. FOGLEMAN, Justice. This appeal results from the conviction of Jerry Leon Gibbs for violation of Ark. Stat. Ann. § 41-2729 (Supp. 1973), which prohibits the exhibition or possession of any obscene film. After he was found guilty by the Municipal Court of the City of Hot Springs, he appealed to the Circuit Court of Garland County, where he was again found guilty. He asserts five points for reversal. We find reversible error in the denial of appellant's motion to suppress film seized by a police officer. We will first treat that ground and later discuss other points which would probably arise on a re-trial.

Appellant moved to "quash" six Peep-show Machines, and the film contained therein, various photographs, two rolls of 8 mm. film and five paper-bound books. He alleged that this property was taken by police officers acting without a search warrant or other court order for its seizure.

On October 18, 1971, Lieutenant Norman Hall of the Hot Springs Police Department noticed signs on the window at Paris Book Store, 258 Central Avenue, advertising "nude movies." He and Sergeant Griffith, another police officer, entered the building and went to a rear room, where they found six or seven machines called "Peep Show Machines" set up. Neither officer had a search warrant, and none had been issued. Hall had gone to this place to investigate upon advice of the Mayor. He observed the films displayed by these machines. It was stipulated those which they saw depicted simulated sex acts; no penetration or actual intercourse was shown. The machines were coin-operated and Hall viewed the films as any patron of the establishment would, i.e., by placing the required coins into the machine. The officers were directed to the room where the machines were located by Gibbs when Hall asked him where the nude movies were. After viewing the film, he arrested Gibbs, who was then the only person in the store, and seized the machines and the films in them. There was no adversary hearing as to the obscenity of the film before the seizure or before Gibbs' trial. The record does not disclose whether the film was shown at his municipal court trial.

A similar question was presented in *Bullard* v. *State,* 252 Ark. 806, 481 S.W. 2d 363. We then recognized, upon the authority of *Lee Art Theater, Inc.* v. *Virginia,* 392 U.S. 636, 88 S. Ct. 2103, 20 L. Ed. 2d 1313 (1968); A *Quantity of Copies of Books* v. *Kansas,* 378 U.S. 205, 84 S. Ct. 1723, 12 L. Ed. 2d 809 (1964); *Marcus* v. *Search Warrants,* 367 U.S. 717, 81 S. Ct. 1708, 6 L. Ed. 2d 1127 (1961), the establishment by the Supreme Court of the United States of a rule that seizure of an allegedly obscene film by a police officer without a prior adversary hearing at which the obscene quality of the film is independently determined by a judicial officer is unreasonable. We also pointed out that, in this respect, the court had found a difference between the seizure of ordinary contraband and matter that, if not obscene, is subject to First Amendment protection. In *Bullard,* we held the court erred in failing to suppress the seizure of film by a police officer who had viewed it because there was no prior adversary hearing. Nothing has changed the rule applied in *Bullard.* It is true that the United States Supreme Court has stated, in

*Heller* v. *New York,* 413 U.S. 483, 93 S. Ct. 2789, 37 L. Ed. 2d 745 (1973), and *Roaden* v. *Kentucky,* 413 U.S. 496, 93 S. Ct. 2769, 37 L. Ed. 2d 757 (1973), that the right to a prior adversary hearing as to obscenity of material arguably protected by the First Amendment is not absolute in all cases, particularly where there is a seizure pursuant to a warrant for preservation of the material as evidence. It is clear, however, from these cases and those upon which we relied in *Bullard,* that there must at least be a determination of probable cause by a neutral magistrate before seizure of allegedly obscene material followed by a prompt post-seizure judicial determination of the obscenity issue at the request of an interested party. It also appears that, under these authorities, the seizure of a film must not prevent continued showing of a film.

In *Roaden,* virtually indistinguishable upon the facts from the case before us, it was held that a seizure such as this is plainly a form of prior restraint and unreasonable under Fourth Amendment standards. The court recognized, however, that there might be exigent circumstances requiring immediate police action to prevent destruction of evidence which would make action without prior judicial evaluation reasonable, but found no such circumstances to exist there. It is not suggested that they existed here.

The state's contention that there was consent, express or implied, to the search through Gibbs' directing Hall and Griffin to the room where the nude movies were being shown merits little attention. It overlooks the lack of evidentiary support, because there is nothing to show that Gibbs even suspected that Hall and Griffith were police officers. It also ignores the fact that it is the seizure, not the search, that is attacked as unreasonable. The state's assertion that the material, since it was actually obscene, was not protected by the First Amendment is likewise without merit. The full impact of the rule declared by decisions of the United States Supreme Court cited above, and those relied upon in *Bullard,* quite clearly applies to material which would be subject to First Amendment protection, except for its obscentiy.

The brief of amicus curiae on this point is based upon

an argument that unlawfulness of the search and seizure does not require suppression of the film because the search and seizure did not lead to the discovery of the crime and because the primary right involved was First Amendment right of access rather than Fourth Amendment immunity from search and seizure. A short answer is that such a position is clearly contrary to the result in *Roaden,* where the reversal was based solely upon the admission of the film in evidence. Cases cited by amicus in support of this argument are pre-*Roaden* decisions.

Amicus also proposes we should not apply the exclusionary rule because it is under severe attack to which it may well succumb. Presently, it is sufficient to say that this court recognized the desirability of the rule before it was imposed upon state courts by the United States Supreme Court. See *Clubb* v. *State,* 230 Ark. 688, 326 S.W. 2d 816; *Burke* v. *State,* 235 Ark. 882, 362 S.W. 2d 695; *Mann* v. *City of Heber Springs,* 239 Ark. 969, 395 S.W. 2d 557, 559 (Johnson, J., concurring). The propriety of the exclusionary rule, in general, has not yet been subjected to frontal attack in this court. Furthermore, the mere fact that the United States Supreme Court has accepted cases for review in which an assault on the exclusionary rule has been mounted is inadequate basis for a clairvoyant prediction that the rule is in the throes of death. There could be no clearer demonstration of our inability to do so, or of the foolhardiness of indulging in such speculation, than the declination by the court of an invitation to abrogate the rule in two of those cases. See *United States* v. *Robinson,* —U.S.— 94 S. Ct. 467 38 L. Ed. 2d 427, and *Gustafson* v. *Florida,* —U.S.—, — 94 S. Ct. 488, 38 L. Ed. 2d 456 (both decided December 11, 1973, subsequent to the original submission of this case). Not only was there no consideration of the advisability of the abandonment of the rule in these cases, it is treated as viable in *Robinson.* It seems that the disposition of both cases would have been simpler if the court had chosen to recede from its exclusionary rule. In another such case, *United States* v. *Calandra,* —U.S. —, 94 S. Ct. 613, 38 L. Ed. 2d —, the court on January 8, this year, simply refused to extend the exclusionary rule to grand jury proceedings upon the premises that a grand jury, unrestrained by evidentiary rules governing criminal trials, may even

consider incompetent evidence and that one has standing to invoke the rule only when evidence illegally obtained, or the fruits thereof, is offered to incriminate the victim of the search. Although the court there deliberately avoided discussion of the rule's efficacy in criminal trials, this case, too, could easily have afforded a vehicle for abandonment of the rule. Certainly, this trio, all under submission at the same time, and argued within a three-day period, would have afforded an ideal vehicle for abandonment of the rule, if such a step is imminent.

Reversal on this point, however, does not require dismissal because of the availability of such procedures as are suggested in *Bullard.*

Appellant's second point for reversal is a contention that the trial court erred by taking judicial notice of contemporary community standards. We think appellant misconstrues the action of the trial court. His argument is based upon the fact that there was no evidence in the record as to these standards, except for the testimony of a police officer who based his opinion upon his own personal feelings and upon the fact that people in the community "were hot about the bookstores" at the time. The circuit judge, who sat as trier of the facts, after waiver of jury trial, in his final opinion, stated his familiarity with community standards in 41 of the 50 states and found the film to go beyond contemporary community standards of "this community, this state and this country." Among other statements of the trial judge in delivering his opinion are these:

> It is inconceivable that the community standards of any average community in this or any other state could approve or condone the activities of the two people shown in this film. * * * A person would have to be deaf, dumb and blind not to understand what this film was about and why people might observe it. The public is neither deaf, dumb nor blind. This film appeals to the animal sex desire and instinct of people and obviously is so intended.

We do not conceive of this procedure as involving judicial notice at all. It must be remembered that the cir-

cuit judge sat as trier of the facts, a jury trial having been waived. As such, he was required to determine: (a) whether the average person applying contemporary standards would find that the material exhibited by appellant, taken as a whole, appealed to the prurient interest; (b) whether the material depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value. *Miller* v. *California,* 413 U.S. 15, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973). In making that determination, the state law to be applied prohibited exhibition of film, the dominant theme of which, when taken as a whole, to the average person applying contemporary community standards, appeals to prurient interest. Ark. Stat. Ann. §§ 41-2729—2731 (Supp. 1971).

In making this determination the judge had the stipulation of the parties, the testimony of the police officer and the films themselves, which he viewed. There was no indication in *Miller* that testimony, either expert or non-expert, was necessary to the fact-finder's determination of the average person's concept of community standards. It was suggested there, however, that reliance must be placed on the jury system to resolve the sensitive questions arising. The court unequivocally held that jury evaluation of materials with reference to community standards adequately served the essential purpose of assuring that, in applying community standards, material be judged by its impact on the average person and not upon either a particularly sensitive or totally insensitive person. In *Paris Adult Theatre I* v. *Slaton,* 413 U.S. 49, 93 S. Ct. 2628, 37 L. Ed. 2d 446 (1973), there was a jury-waived trial. The films were exhibited to the trial court. No other evidence was presented from which the critical fact determinations could have been made. It was there held that the films themselves are the best evidence of what they represent and that, when they are placed in evidence, no "expert" testimony is necessary to establish that they were obscene, when they are not directed at such a bizarre, deviant group that the experience of the trier-of-fact would be plainly inadequate to judge whether the material appeals to the prurient interest.

Of course, the application of community standards is a part of the fact-finding process in making a determination of obscenity. While *Slaton* was a civil proceeding to restrain exhibition of films as obscene, the authorities there cited in support of this principle are all criminal cases. The principles are applied in *Kaplan* v. *California,* 413 U.S. 115, 93 S. Ct. 2680, 37 L. Ed. 2d 492 (1973), which was a criminal prosecution. The appellate court in California had held that the circumstances surrounding the sale of the book in question there and the nature of the book itself constituted sufficient evidence to sustain Kaplan's conviction. The United States Supreme Court said that in cases decided since *Roth* v. *United States,* 354 U.S. 476, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957), it had regarded the questioned materials to be sufficient in themselves for determination of the question whether they are obscene. That court then specifically held that there was no need for "expert" testimony or any other ancillary evidence of obscenity, once the allegedly obscene materials themselves are placed in evidence. The trial judge, as the fact-finder, did not take judicial notice of community standards, but applied them as a fact-finder, just as a jury could do.

What we have said disposes of appellant's contention that the evidence was insufficient to show either community standards or appeal to prurient interest. The only remaining question is the constitutionality of the statute under which Gibbs was convicted. Appellant contends that, in the light of *Miller* v. *California,* supra, Ark. Stat. Ann. §§ 41-2729—2731, being Act 411 of 1967, are unconstitutionally overbroad, vague and indefinite. In addition to the guidelines stated in *Miller,* he relies upon the following language from the opinion:

We acknowledge, however, the inherent dangers of undertaking to regulate any form of expression. State statutes designed to regulate obscene materials must be carefully limited. See Interstate Circuit, Inc. v. Dallas, supra, 390 U.S., at 682—685, 88 S. Ct., at 1302—1305 (1968). As a result, we now confine the permissible scope of such regulation to works which depict or describe sexual conduct. That conduct must be specifically defined by the applicable state law, as

> written or authoritatively construed. A state offense must also be limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value.

Appellant contends that because of this language and the words "sexual conduct specifically defined by the applicable state law," the statute must fall because it neither mentions nor defines sexual conduct. He reads *Miller* as requiring that the sexual conduct which is obscene be spelled out in the statute itself, wholly overlooking the provision that such conduct may be defined by authoritative construction. In *Miller,* the court said that no one could be prosecuted for exposure of obscene materials unless the materials depict or describe patently offensive "hard core" sexual conduct specifically defined by the regulating state law, as written or construed.

On this point, amicus curiae notes that the statute in question meets *Roth* standards, the only constitutional guidelines for the state legislature when the statute was passed. In *Miller,* the court specifically emphasized that there was no necessity for state legislatures to pass new statutes because existing statutes may be determined to be constitutionally adequate, when considered as theretofore or thereafter construed. In *United States* v. *Twelve 200-Foot Reels,* 413 U.S. 123, 93 S. Ct. 2665, 37 L. Ed. 2d 500 (1973), the court in reviewing a United States District Court holding that 19 U.S.C. § 1305 (a) was unconstitutional on its face, recognized its duty to authoritatively construe federal statutes where a serious doubt of constitutionality is raised and a construction of the statute by which the question may be avoided is fairly possible. The court also recognized that it must leave to state courts the construction of state legislation in this respect but emphatically announced its intention, where there is a serious doubt as to the vagueness of such words as "obscene," to construe those words as limiting regulated material to patently offensive representations or descriptions of that specific "hard core" sexual conduct given as examples in *Miller,* all the while conceding that Congress might define other specific "hard core" conduct. The examples are thus stated in *Miller*:

(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.

(b) Patently offensive representation or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals.

Obviously, these examples fall within the common understanding of the meaning of the word. See *State* v. *J-R Distributors, Inc.,* 82 Wash. 2d 584, 512 P. 2d 1049 (1973).

It is quite clear in *Miller* that a definition may be given by the courts as well as by the legislature insofar as federal constitutional standards are concerned. See also, *People* v. *Enskat,* 33 Cal. App. 3d 900, 109 Cal. Rptr. 433 (1973). We also note that in *Roth,* the United States Supreme Court recognized that such terms as "obscene" are not precise, but that lack of precision is not itself offensive to the requirements of due process if the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. Such words, when *applied* according to the proper standard for judging obscenity were said to give adequate warning of the conduct proscribed and mark boundaries sufficiently distinct for judges and juries fairly to administer the law. The court added that the fact that there might be marginal cases in which it is difficult to determine the side of the line upon which a particular fact situation might fall is not sufficient reason to hold the language too ambiguous to define a criminal offense. The statutes upheld in *Roth* as against claims of unconstitutional vagueness were even less specific in defining obscene material than is the statute questioned here. See also, *State* v. *J-R Distributors, Inc.,* 82 Wash. 2d 584, 512 P. 2d 1049 (1973).

It seems to us that the Florida Supreme Court overextended the invitation for judicial construction by actually changing definitions it had used in amplification of the definition of the word "obscene" in a statute using words very similar to the language of ours. That court found no difficulty in changing its construction of the statute to fit *Miller* standards, holding that the language

of the statute made it susceptible to judicial construction compatible with *Miller* standards and definitions. See *Papp* v. *State,* 281 So. 2d 600 (Fla. App. 1973). The Florida court recognized its own definitions were being changed by holding that the new definition could only have prospective effect and that Papp's conviction must be reversed.

We do not have the apparent obstacles to such a construction that the Florida court sought to avoid. We have not construed the definition of obscene material in the statute applied in this case. As amicus points out, our decision in *Bullard* v. *State,* 252 Ark. 806, 481 S.W. 2d 363, wherein we held the definition of the word "obscene" in Ark. Stat. Ann. § 41-2730 sufficiently fair and comprehensive to meet the test of constitutionality, left us with sufficient flexibility for the application of *Miller* standards to our statute. We held in *Bullard* the absence of a requirement that material be "utterly without redeeming social value" before it could be obscene under Ark. Stat. Ann. § 41-2729, did not render the statute constitutionally deficient, because it is not essential that a statute incorporate every constitutional nuance.[1] Also, we are dedicated to the proposition that we must give an act a construction that would meet constitutional tests, if it is reasonably possible to do so. *Stone* v. *State,* 254 Ark. 1011, 498 S.W. 2d 634.

Since we have not construed the act, except in *Bullard,* we follow the pattern established by the United States Supreme Court and followed in *Papp* v. *State,* supra, and hold that obscene film regulated by Ark. Stat. Ann. § 41-2729—2731 is limited to that which constitutes (a) patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated and (b) patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals. See also, *State* v. *J-R Distributors, Inc.,* supra.

---

[1]At that time we thought that this requirement constituted one of the criteria for testing the constitutionality of the statute under *Memoirs* v. *Massachusetts,* 383 U.S. 413, 86 S. Ct. 975, 16 L. Ed. 2d 1 (1966). The application of the principle by which we found our act constitutional was indicated in *Roth* v. *United States,* 354 U.S. 476, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957).

Appellant's contention that the statute falls upon the authority of *Stanley* v. *Georgia,* 394 U.S. 557, 89 S. Ct. 1243, 22 L. Ed. 542 (1969), must likewise be rejected. He argues that the failure of the legislature to specifically except possession of obscene film by one in his own home renders the act unconstitutional. An easy answer to this argument is that appellant has no standing to raise it. *May* v. *State,* 254 Ark. 194, 492 S.W. 2d 888. But, in any event, this argument was rejected in *Paris Adult Theatre I* v. *Slaton,* supra.

The judgment is reversed and the cause remanded for further proceedings pursuant to *Bullard.*