461 So.2d 1040 (1984)
STATE of Louisiana
v.
Raymond PEACOCK et al.
No. 84-KA-0223.
Supreme Court of Louisiana.
December 6, 1984.
Concurring Opinion December 7, 1984.
William Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Clifford R. Strider, Anne Lambert, William R. Campbell, Jr., Joanne Marier, Asst. Dist. Attys., for plaintiff-appellant.
Paul Bonin, Carla A. Failla, New Orleans, for defendant-appellant.
DIXON, Chief Justice.
Defendants Raymond Peacock and Barbara Dearman, along with Peacock Inn, Inc., were charged with obscenity, a violation of R.S. 14:106. The bill of information alleged that the defendants "did wilfully and unlawfully participate or engage in, or manage, sale, produce, present, perform, promote, exhibit, advertise, sponsor or display hard core sexual conduct, to-wit: an untitled motion picture film which depicts hard core indecent sexual conduct with the intent to primarily appeal to the prurient interest of the average person and the hard core sexual conduct is presented in a patently offensive way and taken as a whole lacks serious literary, artistic, political, or scientific value ..."
*1041 The charges were based on the practice of the Peacock Inn of providing its patrons with "adult" movies. The patrons were required to sign an agreement that no one under seventeen years of age would view the movie and to pay an additional fee of three dollars. The movies were then transmitted to the television set in the patrons' room by means of a video cassette player activated by the desk clerk. Undercover police officers rented rooms at the Peacock Inn on two separate occasions and viewed some of the tapes. Based on this information, the officers had a search warrant issued. They executed the warrant, seized the tapes and arrested the defendants.
Defendants filed a pretrial motion to quash the bill of information.[1] They argued, among other things, that the depiction of video tapes on a television screen in a motel room did not meet the statutory requirement of "public portrayal." The district attorney stated during the hearing on the motion that the only issue before the court was whether the tapes were publicly portrayed, arguing, of course, that they were. The trial court ruled that the public portrayal requirement was not met and granted the motion to quash. The state applied to the court of appeal for a writ of certiorari. The court of appeal granted the state's writ on original hearing and then recalled its order on rehearing, noting that the state had a proper remedy by appeal pursuant to Article 912(B)(1) of the Code of Criminal Procedure.
Article 912(B)(1) provides the state with the right to appeal an adverse ruling on a motion to quash. There is, however, no appeal direct to this court. As Article 911 indicates, an appeal is "the exercise of the right of the state or the defendant to have a judgment or ruling reviewed by the proper appellate court...." The latest amendment to Art. 5, § 5(D) of the Louisiana Constitution vests this court with appellate jurisdiction in only two instances: when a law or ordinance has been declared unconstitutional, or when a defendant has been convicted of a capital offense and a death penalty has been actually imposed.[2] Further, this court has consistently held that under the Constitution of 1974, the state has the right of appeal to the supreme court only when a law or ordinance has been declared unconstitutional.[3]
The intermediate appellate courts, under Art. 5, § 10(A) as amended, have appellate jurisdiction over "all criminal cases triable by a jury except as provided in § 5, Paragraph (D)(2) of ... Article 5." The defendants in the case at bar were arrested in May of 1982, which was prior to the effective date of Act 843. However, amended Subsection (E) of § 5 states that the determinative date is not the date of the offense but rather the date that the order of appeal is signed. Since the trial court ruled on this motion subsequent to July 1, 1982, the Constitution vests appellate jurisdiction in the court of appeal not the supreme court.
However, since the court of appeal has made its views on the merits known on its original hearing, and since this case has already been briefed and argued in this court, judicial economy will best be served by exercising our supervisory jurisdiction. La. Const. Art. 5, § 5(A).
Before arriving at the merits of the case, however, it is necessary, due to some confusion about the obscenity statute, to review some history of obscenity law.
The pertinent provisions of R.S. 14:106, as it existed at the time of the offense, read as follows:

*1042 "A. The crime of obscenity is the intentional:
(1) Exposure of the genitals, pubic hair, anus, vulva, or female breast nipples in any public place or place open to the public view with the intent of arousing sexual desire or which appeals to prurient interest or is patently offensive.
(2) Participation or engagement in, or management, production, presentation, performance, promotion, exhibition, advertisement, sponsorship, or display of, hard core sexual conduct when the trier of fact determines that the average person applying contemporary community standards would find that the conduct, taken as a whole, appeals to the prurient interest; and the hard core sexual conduct, as specifically defined herein, is presented in a patently offensive way; and the conduct taken as a whole lacks serious literary, artistic, political, or scientific value.
Hard core sexual conduct is the public portrayal, for its own sake, and for enusing (sic) commercial gain of:
(a) Ultimate sexual acts, normal or perverted, actual, simulated or animated, whether between human beings, animals, or an animal and a human being; or
(b) Masturbation, excretory functions or lewd exhibition, actual, simulated or animated, of the genitals, pubic hair, anus, vulva, or female breast nipples; or
(c) Sadomasochistic abuse, meaning actual, simulated or animated, flagellation, or torture by or upon a person who is nude or clad in undergarments or in a costume which reveals the pubic hair, anus, vulva, genitals, or female breast nipples, or in the condition of being fettured (sic), bound, or otherwise physically restrained, on the part of one so clothed; or
(d) Actual, simulated, or animated touching, caressing, or fondling of, or other similar physical contact with a pubic area, anus, female breast nipple, covered or exposed, whether alone or between humans, animals, or a human and an animal, of the same or opposite sex, in an act of apparent sexual stimulation or gratification; or
(e) Actual, simulated, or animated stimulation of a human genital organ by any device whether or not the device is designed, manufactured, or marketed for such purpose.
(3) Sale, allocation, consignment, distribution, dissemination, advertisement, exhibition, or display of obscene material, or the preparation, manufacture, publication, or printing of obscene material for sale, allocation, consignment, distribution, advertisement, exhibition, or display.
Obscene material is any tangible work or thing the trier of fact determines (a) that the average person applying contemporary community standards would find, taken as a whole, appeals to the prurient interest, and (b) depicts or describes in a patently offensive way, hard core sexual conduct specifically defined in Paragraph (2) above, and (c) the work or thing taken as a whole lacks serious literary, artistic, political, or scientific value.
(4) Requiring as a condition to a sale, allocation, consignment, or delivery for resale of any paper, magazine, book, periodical, or publication to a purchaser or consignee that such purchaser or consignee also receive or accept any obscene material, as defined in Paragraph (3) above, for resale, distribution, display, advertisement, or exhibition purposes; or, denying or threatening to deny a franchise to, or imposing a penalty, on or against, a person by reason of his refusal to accept, or his return of, such obscene material."
The obscenity statute has been amended a number of times since its original enactment in 1884 in an attempt by the legislature to define obscenity more precisely. The most recent revision appears in Acts 1974, No. 274. Act 274 was the legislature's response to our opinion in State v. Shreveport News Agency, Inc., 287 So.2d 464 (La.1973), which held that R.S. 14:106, as it then existed, did not meet the standards set forth by the United States Supreme *1043 Court in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).
In that case a majority of the United States Supreme Court rejected previous attempts by that court to define obscenity and formulated a new three part test:
"The basic guidelines for the trier of fact must be:
(a) whether `the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest * * *,
(b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." Id. 413 U.S. at 24 [93 S.Ct. at 2615].
These standards were incorporated into the rewritten version of 14:106 by the legislature in Act 274. A majority of this court subsequently held in State v. Amato, 343 So.2d 698 (La.1977), that the new 14:106 did indeed conform to the constitutional safeguards laid down in Miller v. California, supra.
Although the present statute might appear to be a mass of redundancies, careful reading of the statute reveals an underlying and logical scheme. Subsection (1) prohibits the exposure of certain parts of the body "in a public place or place open to the public view." This section is intended to cover situations such as in State v. Muller, 365 So.2d 464 (La.1978), where a person exposes his genitals.
Subsection (2) outlaws the "participation or engagement in or management, production, presentation, performance ... of hard core sexual conduct" when such conduct appeals to the prurient interest, is presented in a patently offensive way and lacks serious literary, artistic, political, or scientific value. Hard core sexual conduct is defined in subsection (2) as the "public portrayal, for its own sake, and for ensuing commercial gain of: ultimate sexual acts,... masturbation, ... sadomasochistic abuse, ... animated touching," etc. Subsection (2), as evidenced by its language, is intended to cover live stage shows and performances in which the actors actually perform the proscribed acts in front of an audience.
Finally, subsection (3) forbids the "sale... exhibition or display of obscene material..." Obscene material is defined as a "tangible work" which appeals to the prurient interest, lacks serious literary, etc. value, and depicts in a patently offensive way hard core sexual conduct as "specifically defined in Paragraph (2) above." This subsection is obviously intended to cover sales, etc. of pornographic books, magazines, tapes, movies, or any other "tangible work."
Although the bill of information in the instant case is broad enough to cover offenses defined in both subsections (2) and (3), under the undisputed facts, the offense could be prosecuted only under subsection (3), that is, "the exhibition or display of obscene material."
As mentioned previously, the litigants and the trial court are under the impression that in order to obtain a conviction for a violation of subsection (3), the state must prove that the hard core sexual conduct was "publicly portrayed" as subsection (2) seems to require. If this is true, then the sale of a pornographic movie by a merchant to a customer for use in the customer's private home would not be encompassed by the statute. Although we use the term "legislative intent" with great circumspection, we do not believe that an overall reading of the statute indicates a legislative intent to exclude such sales from the coverage of the statute.
Although the mere possession of obscene material is not and has never been a criminal offense,[4] the sale and display of obscene *1044 material has been an object of legislative prohibition since, at least, 1884.[5]
Under the prior versions of the statute, there was no requirement, or even the mention of, public portrayal. The mere sale or exhibition of obscene material for private consumption was clearly prohibited. However, the addition of the term "public portrayal" in Act 274 could be construed to have added a new requirement.
But the general rule of statutory construction, that "the mere fact of statutory amendment manifests the legislative intent to effect change which alters legal rights and disabilities,"[6] is not applicable here. There is no evidence that the legislature rewrote R.S. 14:106 in order to add a public portrayal requirement to the prohibition against the sale and display of obscene material. Rather it is clear that the sole purpose of Act 274 was to "constitutionalize" 14:106 by incorporating into it the standards set forth in Miller v. California, supra. Further, there is no language in Miller which can be interpreted to require that obscene material involve a public portrayal.
R.S. 14:106(A)(3) prohibits the distribution and display of obscene material which "appeals to the prurient interest" (106(A)(3)(a)) and "depicts or describes" (106(A)(3)(b)) offensively hard core sexual conduct "specifically defined in Paragraph (2) above" and which lacks serious value. (R.S. 14:106(A)(3)(c). Hard core sexual conduct in R.S. 14:106(A)(2) is "the public portrayal, for its own sake, and for ensuing commercial gain of" acts described in subsections (a)(b)(c)(d) and (e).
To interpret this statute literally is difficult. Literally, the statute prohibits the sale, distribution or advertisement of tangible works depicting hard core sexual conduct only if the "conduct is the public portrayal" of specified sexual acts. (106(A)(3)(b)) refers to hard core sexual conduct as "specifically defined in Paragraph (2) above," which defines hard core sexual conduct as "public portrayal" of certain acts.) Yet, 106(A)(3) prohibits the "exhibition or display" of obscene material.
Penal statutes must be strictly construed against the state. Nevertheless, they must be "given a genuine construction, according to the fair import of their words ... in connection with the context, and with reference to the purpose of the provision." R.S. 14:3.
Applying this rule of construction, it is clear that the purpose of 106(A)(3) is to prohibit the distribution of tangible works depicting or describing the sexual acts described in 106(A)(2)(a)(b)(c)(d)(e).
Consistently with the long history of the attempted prohibition against the distribution of obscene material in Louisiana, we find no convincing argument or evidence that only the sale of films and magazines for "public portrayal" is illegal.
Whether or not the room in the Peacock Inn is public or private[7] is irrelevant to this case. The defendants here are charged with the exhibition and display of obscene material, a crime.
Since there is no public portrayal requirement for a violation of subsection (3), the trial court's grant of the defendants' motion to quash, based on its determination that a public portrayal of the tape was not demonstrated, is reversed.
Accordingly, the case is remanded to the district court for further proceedings consistent with this opinion.
DENNIS, J., concurs with reasons.
*1045 WATSON, J., concurs and assigns reasons.
LEMMON, J., concurs for the reasons assigned by DENNIS, J.
DENNIS, Justice, concurring.
I respectfully concur.
The activities in the present case are not protected by any privacy right emanating from the Fourth Amendment or from the "penumbra" of that and other amendments. In Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), the court held that mere private possession of obscene material in one's home cannot be a crime. However, every case since Stanley has explicitly limited it to its holding. In United States v. 12 200-Ft. Reels of Super 8MM. Film, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973), the court stated
[C]laimant contends that, under Stanley, the right to possess obscene material in the privacy of the home creates a right to acquire it or import it from another country. This overlooks the explicity narrow and precisely delineated privacy right on which Stanley rests.
* * * * * *
We are not disposed to extend the precise, carefully limited holding of Stanley to permit importation of admittedly obscene materials simply because it is imported for private use only.... We have already indicated that the protected right to possess obscene material in the privacy of one's home does not give rise to a correlative right to have someone sell or give it to others.... Nor is there any correlative right to transport obscene material in interstate commerce. 93 S.Ct. at 2668-69 (Citations omitted.).
See also United States v. Orito, 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973). The court has reaffirmed these holdings in Smith v. United States, 431 U.S. 291, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977), where the court stated "Stanley did not create a right to receive, transport, or distribute obscene material, even though it had established the right to possess the material in the privacy of the home." 97 S.Ct. at 1767 (citations omitted). Therefore, although it would have to be admitted that a hotel patron has a right to privacy similar to a person's right to privacy in his own home, see Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), the right is not extended to give other persons a right to provide obscenity for viewing in a place of privacy. The defendants here are the hotel and its operators. Since the defendants were not the occupants of the room, they cannot raise the limited protection of Stanley. The defendants conduct in providing the obscene movies is without constitutional protection regardless of the patrons' rights.
The decisions of the United States Supreme Court indicate that either public portrayal or commercial exploitation of otherwise obscene material is sufficient to deprive the material of constitutional protection. Obscenity does not have to be shown in public before it can be prohibited; it is enough that it is in commerce and available to the public, even if purchasers view it only in private. In Paris Adult Theatres I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973), the court stated:

Commercial exploitation of depictions, descriptions, or exhibitions of obscene conduct on commercial premises open to the public falls within a State's broad power to regulate commerce and protect the public environment.
* * * * * *
In this case we hold that the States have a legitimate interest in regulating commerce in obscene material and in regulating exhibition of obscene material in places of public accomodation. 93 S.Ct. at 2641-42 (emphasis added).
In United States v. Orito, supra, the court stated:
[T]he Government has a legitimate interest in protecting the public commercial environment by preventing [obscenity] from entering the stream of commerce. 93 S.Ct. at 2678.
*1046 In Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), the court indicated that selling obscene materials to individual members of the public could be prohibited regardless of whether the material was also exhibited in public. The court said:
Sex and nudity may not be exploited without limit by films or pictures exhibited or sold in places of public accommodation any more than live sex and nudity can be exhibited or sold without limit in such public places. 93 S.Ct. at 2615-16 (Emphasis added).
Thus, it is clear that public portrayal, in the sense of actually exhibiting the material in public, is not required before the otherwise obscene (under Miller) material is without First Amendment protection. Commercial exploitation of the obscene subject matter is enough to remove it from the protection of the First Amendment and to give the state the power to regulate it.
The defendants argue that the statute requires not only commercial exploitation of otherwise obscene materials but also public portrayal of them before the exploiter can be punished. This would mean that otherwise pornographic books and films could be commercially exploited without limitation because the purveyors would need only make certain that their customers not peruse or view their products in a public place.
La.R.S. 14:3 requires that we extend no crime definition by analogy so as to create crimes not provided for by statute; however, it also requires that, in order to promote justice and to effect the objects of the law, all of its provisions shall be given a genuine construction, according to the fair import of their words, taken in their usual sense, in connection with the context, and with deference to the purpose of the provision.
The statutory provision at issue, La.R.S. 14:106 A(3) is loosely worded because it is based upon a lack of precision in the Miller opinion wherein the court referred to "film or pictures exhibited or sold in places of public accommodation" under the catch-all term of "public portrayal". Nevertheless, a genuine construction of the statute with reference to its purpose, the fair import of its words, and the use common sense, indicates that it was not the aim of the legislature to suppress the commercial exploitation of only publicly exhibited obscenity. The objective of the lawmakers was to prevent all pornographic materials from entering the stream of commerce regardless of whether they are exhibited publicly. The reference to the definition of hard core sexual conduct clearly applies only to the sexual behavior itself and not to its public display. This is a genuine and reasonable construction of the statute and does not create a crime for which it does not provide.
NOTES
[1] According to the state's brief, both defendants filed a motion to quash and the two cases were consolidated by the trial court for the purpose of the hearing. Both defendants were present. At the end of the hearing defense counsel moved to adopt Ms. Dearman's motion in the Peacock case. The state had no objection if defense counsel would submit the motion in writing. The defense was to file the second motion to quash and the court agreed to give the same ruling. However, only Ms. Dearman's motion to quash appears in the record.
[2] See Acts 1980, No. 843, § 1, which amended § 5 and § 10 of Art. 5.
[3] State v. Johnson, 342 So.2d 863 (La.1977); State v. James, 329 So.2d 713 (La.1976).
[4] Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).
[5] See Acts 1884, No. 111, § 1; 1934, No. 110, § 1; 1942, No. 43, Art. 106; 1950, No. 314, § 1; 1958, No. 388, § 1; 1960, No. 199, § 1; 1962, No. 87, § 1; 1968, No. 647, § 1; 1970, No. 167, § 1; 1972, No. 605, § 1; 1972, No. 743, § 1; 1974, No. 274, § 1.
[6] State v. Muller, 365 So.2d 464, 466 (La.1978).
[7] The author is of the opinion that a hotel room is clearly a private place. Once rented, a hotel room becomes clothed with constitutional protections. Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964).