AMERICAN INFORMATION ENTERPRISES, INC.; Dial Information Services, Corp. of New York; Fabulous Associates, Inc.; Source Communications, Inc.; and Tele–Pro Communications Corp., Plaintiffs,

v.

Richard L. THORNBURGH, Attorney General of the United States, Defendant.

No. 90 Civ. 1719 (RPP).

United States District Court, S.D. New York.

Aug. 13, 1990.

---

Otto Obermaier, U.S. Atty., S.D.N.Y., Nancy Kilson, Jed Rubenfeld, New York City, for the Government.

Seham, Klein & Zelman, Joel R. Dichter, Roger H. Briton, James A. Brown, New York City, for plaintiffs.

New York Civil Liberties Union, Steven L. Glauberman, Norman Siegel, Arthur Eisenberg, Leavy, Rosenweig & Hyman, Steven Hyman, Lankanau & Bickford, Elizabeth McNamara, LAMBDA Legal Defense and Educ. Fund, Inc., Evan Wolfson, New York City, for New York Civil Liberties Union, VV Pub., Inc., and LAMDA Legal Defense and Educ. Fund, Inc., appearing as Amicus Curiae.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Plaintiffs move, pursuant to Federal Rule of Civil Procedure 65(a), for a preliminary injunction enjoining the enforcement of that portion of the 1989 amendment to the Communications Act of 1934, 47 U.S.C. §§ 223(b) and (c) ("the Helms Amendment"), which regulates the communication of "indecent" speech over the telephone. Plaintiffs, who refer to themselves as "information providers" ("IP's"), operate various types of commercial telephone services, which offer listeners, either exclusively or in part, a sexually explicit content. Plaintiffs claim that the Helms Amendment violates the First and Fifth Amendments to the Constitution.[1] The Court held evidentiary hearings on March 20, 1990 and May 9, 10, 14, 15, 16, 1990 on the merits of preliminary injunctive relief. The Court refrains from consolidating those hearings with a trial on the merits of plaintiffs' request for a permanent injunction, pursuant to Federal Rule of Civil Procedure 65(a)(2), in deference to the government's request for time to gather additional evidence before a trial.

### I. The Helms Amendment's Restrictions on Indecent Speech

The Helms Amendment sets forth civil and criminal penalties for the knowing transmission of obscene and indecent communications by means of telephone. The portion of 47 U.S.C. § 223, of which plaintiffs seek to enjoin the enforcement, is as follows:

(b) PROHIBITED COMMERCIAL PURPOSES; DEFENSE TO PROSECUTION

(1) [bans obscene communications]....

(2) Whoever knowingly—

(A) within the United States, by means of telephone, makes (directly or by recording device) any *indecent communication for commercial purposes* which is available to any person under 18 years of age or any other person without that person's consent, regardless of whether the maker of such communication placed the call; or

(B) permits any telephone facility under such person's control to be used for an activity prohibited by subparagraph (A), shall be fined not more than $50,000 or imprisoned not more than six months, or both.

(3) It is a defense to prosecution under paragraph (2) of this subsection that the defendant restrict access to the prohibited communication to persons 18 years of age or older in accordance with subsection (c) of this section and with such procedures as the [Federal Communications] Commission may prescribe by regulation.

(4) In addition to the penalties under paragraph (1), whoever, within the United States, intentionally violates paragraph (1) or (2) shall be subject to a fine of not more than $50,000 for each violation. For purposes of this paragraph, each day of violation shall constitute a separate violation.

(5)(A) In addition to the penalties under paragraphs (1), (2), and (5), whoever, within the United States, violates paragraph (1) or (2) shall be subject to a civil fine of not more than $50,000 for each violation. For purposes of

---

1. Appearing as amicus curiae are the New York Civil Liberties Union, VV Publishing, Inc., and LAMBDA Legal Defense and Education Fund, Inc.

this paragraph, each day of violation shall constitute a separate violation.

(B) A fine under this paragraph may be assessed either—

(i) by a court, pursuant to civil action by the Commission or any attorney employed by the Commission who is designated by the Commission for such purposes, or

(ii) by the Commission after appropriate administrative proceedings.

(6) The Attorney General may bring a suit in the appropriate district court of the United States to enjoin any act or practice which violates paragraph (1) or (2). An injunction may be granted in accordance with the Federal Rules of Civil Procedure.

(c) RESTRICTION ON ACCESS TO SUBSCRIBERS BY COMMON CARRIERS; JUDICIAL REMEDIES RESPECTING RESTRICTIONS

(1) A common carrier within the District of Columbia or within any State, or in interstate or foreign commerce, shall not, to the extent technically feasible, provide access to a communication specified in subsection (b) of this section from the telephone of any subscriber who has not previously requested in writing the carrier to provide access to such communication if the carrier collects from subscribers an identifiable charge for such communication that the carrier remits, in whole or in part, to the provider of such communication.

(2) Except as provided in paragraph (3), no cause of action may be brought in any administrative agency against any common carrier, or any of its affiliates, including their officers, directors, employees, agents, or authorized representatives on account of—

(A) any action which the carrier demonstrates was taken in good faith to restrict access pursuant to paragraph (1) of this subsection; or

(B) any access permitted—

(i) in good faith reliance upon the lack of any representation by a provider of communications that communications provided by that provider are communications specified in subsection (b) of this section, or

(ii) because a specific representation by the provider did not allow the carrier, acting in good faith, a sufficient period to restrict access to communications described in subsection (b) of this section.

(3) Notwithstanding paragraph (2) of this subsection, a provider of communications services to which subscribers are denied access pursuant to paragraph (1) of this subsection may bring an action for a declaratory judgment or similar action in a court. Any such action shall be limited to the question of whether the communications which the provider seeks to provide fall within the category of communications to which the carrier will provide access only to subscribers who have previously requested such access.

47 U.S.C.A. § 223(b) and (c) (Supp.1990) (emphasis added).

Pursuant to Section 223(b)(3), if an IP complies with both the restrictions set forth in Section 223(c) and the regulations promulgated by the Federal Communications Commission (FCC), then that IP can communicate indecent speech without being subject to criminal or civil penalties. The restriction set forth by Section 223(c)(1) is that a common carrier (*i.e.*, the telephone company) either must refrain from engaging in billing and collection for an IP or else the telephone company must limit access to the IP to those telephone customers who have presubscribed in writing requesting access to the IP's' services.

The FCC regulations, adopted in June 1990 and to become effective August 14, 1990, further provide that IP's can only qualify for the safe harbor from the Section 223(b)(2)'s penalties for indecent communications if: (1) the IP has notified the common carrier in writing that he or she is providing a telephone service with an indecent content; and (2) the IP either (a) "[r]equires payment by credit card before transmission of the message;" (b)

"[r]equires an authorized access or identification code before transmission of the message"; or (c) "scrambles the message using any technique that renders the audio unintelligible and incomprehensible to the calling party unless that party uses a descrambler." 47 C.F.R. 64.201((a), reprinted in, *In re Regulations Concerning Indecent Communications by Telephone*, Gen. Docket No. 90–64, Report and Order, released June 29, 1990 [hereinafter cited as "Report and Order"].

All parties agree that this Court does not have jurisdiction to review the constitutionality of the FCC regulations, pursuant to 28 U.S.C. § 2342(1) which grants Circuit Courts exclusive jurisdiction "to enjoin ... or to determine the validity of" final regulations ordered by the FCC. Accordingly, the only restriction on indecent speech which this Court will review are the statute's effect of limiting an IP's communication of indecent speech over telephone lines by causing IP's either to engage in billing and collection independent of the telephone company or to be subject to compliance with the telephone company's implementation of a system of written pre-subscription.

## II. Justiciability

### A. *Extent of Plaintiffs' Standing*

Both sides have stipulated before the Court that plaintiffs represent the constitutional interests of their listeners, as well as their own interests as speakers. The Supreme Court made a similar recognition in *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), where, even though the plaintiff was the corporate speaker rather than the listener, it rested its decision in part on "the [First Amendment] right of *the public* to receive suitable access." *Id.* at 390, 89 S.Ct. at 1806 (emphasis added); *see also Virginia State Pharmacy Board v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57, 96 S.Ct. 1817, 1822–23, 48 L.Ed.2d 346 (1976); *Kleindienst v. Mandel*, 408 U.S. 753, 762–63, 92 S.Ct. 2576, 2581–82, 33 L.Ed.2d 683 (1972) (surveying history of First Amendment rights of listeners).

### B. *Ripeness*

■ In a challenge to a prior version of the Helms Amendment, the Second Circuit held that a determination of whether the challenge is ripe depends upon " 'a twofold inquiry evaluating the hardship to the parties of withholding judicial determination and evaluating whether the issues are fit for judicial determination.' " *Carlin Communications, Inc. v. FCC*, 749 F.2d 113, 123 n. 20 (2d Cir.1984) [hereinafter *Carlin I*] (quoting *Seafarers Int'l Union v. United States Coast Guard*, 736 F.2d 19, 26 (2d Cir.1984)). The Court finds that the case is ripe because plaintiffs allege that the statute is directly aimed at constitutionally protected speech and their business interests, *see Roe v. Meese*, 689 F.Supp. 344, 345 (S.D.N.Y.1988) (analogous challenge to constitutionality of earlier version of Helms Amendment) (citing *Virginia v. American Booksellers Association, Inc.*, 484 U.S. 383, 108 S.Ct. 636, 642, 98 L.Ed.2d 782 (1988) ("injury in fact" requirement in First Amendment context)), and because enforcement of the statute is now imminent.

By letter dated March 19, 1990, the government informed the Court that it would refrain from enforcing the statute until the FCC promulgated regulations in connection with the statute. The FCC regulations appeared in the Federal Register on July 16, 1990 and stated that on August 15, 1990 the regulations would become effective. 55 Fed.Reg. 28,915 (1990). Accordingly, there is an imminent threat of enforcement of the Helms Amendment as of August 15, 1990 and this First Amendment challenge is ripe for judicial determination.

## III. Preliminary Injunction Standard

In the Second Circuit, a party seeking injunctive relief must establish: (1) that the injunction is necessary to prevent irreparable harm and (2) either (a) a likelihood of prevailing on the merits of the case or (b) the existence of both (i) sufficiently serious questions going to the merits as to make them a fair ground for litigation and (ii) a balance of the hardships tipping decidedly

toward the movant. *Reuters Limited v. United Press International, Inc.*, 903 F.2d 904, 907 (2d Cir.1990) (citations omitted). The Second Circuit also holds that:

> where the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous fair-ground-for-litigation standard and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood of success on the merits of his claim.

*Plaza Health Laboratories, Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989). The actions to enforce the Helms Amendment would be taken in the public's interest in protecting minors. Accordingly, the Court follows *Plaza Health* and determines whether to grant this preliminary injunction based on whether plaintiffs have established (1) that there is an imminent threat of irreparable harm and (2) that there is a likelihood that plaintiffs will succeed on the merits.

## IV. Irreparable Harm

■ The Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976). Thus, if plaintiffs show that the enforcement of the Helms Amendment either violates the First Amendment, or infringes on First Amendment rights and interests protected by the Fifth Amendment's due process clause, then plaintiffs will have demonstrated irreparable injury. The Court will examine the likelihood of plaintiffs prevailing on their claims that there will be a loss of First Amendment freedoms because (1) the statute does not employ the least restrictive means to effect a compelling government interest; (2) the statute is void for vagueness; and (3) the statute contains a system of prior restraint unaccompanied by adequate procedural safeguards.

## V. Likelihood of Success on The Merits

### A. *First Amendment*

#### 1. Content or Content Neutral

The First Amendment states in pertinent part: "Congress shall make no law ... abridging the freedom of speech." The government does not dispute that "indecent communication for commercial purposes" "by means of telephone" is "speech" and therefore the Helms Amendment implicates the First Amendment.

The threshold issue in this First Amendment scrutiny of the Helms Amendment is whether it is a content-based or content neutral regulation of speech.

■ A restriction on speech is content neutral if it can be " 'justified without reference to the content of the regulated speech.' " *United States v. Eichman*, —— U.S. ——, 110 S.Ct. 2404, 2409, 110 L.Ed.2d 287 (1990) (quoting *Boos v. Barry*, 485 U.S. 312, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988)); *Young v. New York City Transit Authority*, 903 F.2d 146, 158 (2d Cir.1990) ("the real question is whether the dangers relied on as justification for the regulation arise *at least in some measure* from the alleged communicative content of the conduct") (emphasis added).

In *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), the Supreme Court scrutinized a zoning ordinance restricting the possible locations of "theatres specializing in adult films." *Id.* at 47, 106 S.Ct. at 928. Justice Rehnquist, writing for the majority, held that the ordinance was content-neutral because its justification was based upon the "secondary effects of such theatres in the surrounding community," *ibid.*, such as the devaluation of property, an increase in crime and the deterioration of the residential character of an area.

Here, the justification for the Helms Amendment is the psychological impact of indecent telephone speech on minors. Such a justification is not content neutral. It constitutes a primary rather than a secondary effect. Justice O'Connor, writing for the Supreme Court in *Boos v. Barry*, recognized that if the regulation in *Renton*

had been "justified by the city's desire to prevent the psychological damage it felt was associated with viewing adult movies then analysis of the measure as a content-based statute would have been appropriate." 108 S.Ct. at 1163. *See also* 108 S.Ct. at 1171 (Brennan, J., concurring) ("Whatever 'secondary effects' means, ... it cannot include listeners' reactions to speech.") (citing *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988)). Accordingly, as a regulation aimed at the content of indecent telephone speech, the Helms Amendment's procedural mechanisms and substantive terminology must be scrutinized. *See Sable Communications of California, Inc. v. FCC*, — U.S. —, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989) (regulation of indecent commercial telephone communications is a regulation of the "content of constitutionally protected speech").[2]

2. Compelling Government Interest and Least Restrictive Means

■ The First Amendment permits Congress to enact content-based regulations of indecent speech communicated by telephone for commercial purposes if the statute sets forth the least restrictive means of accomplishing a compelling government interest. *Sable*, 109 S.Ct. at 2836.

■ The legislative history of the Helms Amendment states that the intention of the statute is to protect the psychological well-being of minors. This purpose is a compelling interest and justifies a restriction on indecent speech.[3] *Sable*, 109 S.Ct. at 2836; *see also Osborne v. Ohio*, — U.S. —,

110 S.Ct. 1691, 109 L.Ed.2d 98 (1990). Accordingly, the issue is whether the least restrictive means of preventing minors from obtaining access to indecent commercial telephone communications are embodied in the statute's requirement that an IP either engage in billing and collection independent of the carrier or subject itself to a presubscription requirement. The least restrictive means test requires that the Court review each technologically feasible option and determine whether the government has met its burden of showing that it has chosen the effective option which is the least restrictive. *See Carlin I*, 749 F.2d at 121 ("The government bears the heavy burden of demonstrating that a compelling state interest could not be served by restrictions that are less intrusive on protected forms of expression."). A regulation on indecent telephone communications is considered to be effective in its protection of minors even though it permits "a few of the most enterprising and disobedient young people ... [to] manage to secure access to such messages." *Sable*, 109 S.Ct. at 2838.

Plaintiffs argue that it is likely that the government will not be able to meet its burden at trial of rebutting plaintiffs' contention that the system for restricting minors' access to indecent telephone communications which is currently in use in New York State, if properly publicized and implemented, would be effective and less restrictive than the means set forth in the Helms Amendment. The New York Public Service Commission has instituted a system called voluntary blocking. Under this system, any household can have its access to

---

**2.** The finding that *Renton's* content-neutral analysis does not govern this scrutiny of content-based restrictions also means that *Renton's* holding that the First Amendment does not protect against economic hardship does not apply here. *See Renton*, 475 U.S. at 54, 106 S.Ct. at 932. A content-neutral restriction is constitutional as long as it enables the restricted speaker to have "a reasonable opportunity to open and operate an adult theatre within the city." *Id.* On the other hand, a content regulation, is only constitutional if it is the least restrictive means of accomplishing a compelling government interest. *See infra.* Economic impact is a factor in determining which means of regulation are the least restrictive. *See, e.g., Fabulous Associates v. Pennsylvania Public Utility Commission,*

896 F.2d 780, 785–87 (3d Cir.1990) (giving weight to costs imposed on IP's by regulations on indecent telephone speech) (citing *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943) ("the First Amendment is not available 'merely to those who can pay their own way.' ")).

**3.** In addition, the government presented the expert testimony of Dr. Park Dietz on the possible psychological harms resulting from a child's exposure to some of the sexually explicit telephone messages marketed by IP's. The Court intimates no opinion on whether the messages discussed by Dr. Dietz are "obscene" or "indecent," because that issue is not before the Court.

sexually explicit telephone services, as well as other commercial telephone services, blocked free of charge by contacting the telephone company and requesting central blocking. The telephone company is able to implement such a system by assigning certain types of telephone services the same three digit prefix and then centrally blocking a household's access to all numbers with that prefix.[4] In addition, access to the services are permanently blocked from all payphones and from telephones outside of New York State. New York Telephone also will centrally block a telephone if there have been two complaints about a bill for charges for calls to adult telephone services. Since such charges appear itemized on New York's telephone bills, a parent receives notice that such calls are being made. In addition, if a parent calls to dispute or complain about an adult service telephone charge which appears on the bill then the customer representative will discuss the availability of central blocking. Tr. 382.

While restrictions on access to indecent telephone communications have been subject to detailed scrutiny by the Second Circuit on three occasions, see *Carlin Communications, Inc. v. FCC*, 837 F.2d 546 (2d Cir.) [hereinafter *Carlin III*], cert. denied, 488 U.S. 924, 109 S.Ct. 305, 102 L.Ed.2d 324 (1988); *Carlin Communications, Inc. v. FCC*, 787 F.2d 846 (2d Cir.1986) [hereinafter *Carlin II*]; *Carlin I, supra;* the voluntary blocking option has yet to be reviewed because at the time of *Carlin III* it was still technologically infeasible.[5] *See Fabulous Associates, Inc.*, 896 F.2d at 788 n. 7; *Carlin II*, 749 F.2d at 851. In the Third Circuit's more recent "least restrictive means" review of Pennsylvania's regulation of indecent telephone communications, the voluntary blocking option was only referred to, along with the pre-subscription with the telephone company option, as less restrictive than the option of

requiring a caller to obtain an access code from the IP. *See Fabulous Associates, Inc., supra.* Although the Third Circuit found that the pre-subscription and voluntary blocking options were effective means of satisfying the state's interest in protecting minors, the Circuit Court did not evaluate the comparative restrictiveness of the two options.

This is the first time that a court has been asked to evaluate the comparative restrictiveness and effectiveness of the option of voluntary blocking as opposed to the option of either implementing pre-subscription or engaging in independent billing and collection. The Supreme Court instructs that in this scenario the judiciary's usual " '[d]eference to legislative findings cannot limit judicial inquiry [because] ... First Amendment rights are at stake.' " *Sable*, 109 S.Ct. at 2838 (quoting *Landmark Communications v. Virginia*, 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978)).

The government's case here is made difficult because, as in *Sable*, the "congressional record contains no legislative findings that would justify us in concluding that there is no constitutionally acceptable less restrictive means." *Sable*, 109 S.Ct. at 2838. The Helms Amendment emerged from the Senate in the waning days of a congressional session. No committee reviewed the bill and the Senate "only had a few minutes to consider" the proposed bill. *See* Cong.Rec. S15796, S15800 (daily ed. Nov. 16, 1989) (remarks of Sen. Spector). Senator Spector noted that "the last time the issue of dial-a-porn was presented to the Congress it was an amendment very much in this posture, without being carefully and deliberately crafted to ensure it would pass constitutional muster." Cong. Rec. S15796 (Nov. 16, 1989). That statute was struck down in *Sable* because the government could not satisfy its burden of

---

4. Although on New York's 970 prefix there are currently non-sexual services, such as lottery results, it is feasible to put the adult services exclusively on one prefix. Tr. 383.

5. The discussions of "blocking" in *Carlin II* and *Carlin III* refer to "home based blocking" which

operates through the installation of equipment in one's telephone. The Second Circuit rejected "home based blocking" as costly and ineffective, because the device could easily be taken apart by a child.

demonstrating that the statute embodied the least restrictive means of effecting the government's compelling interest. With respect to the 1989 Helms Amendment, Senator Spector attempted to compensate by proposing a "colloquy for purposes of legislative history ... to do our very best to satisfy the Supreme Court." Cong.Rec. S15800 (Nov. 16, 1989). However, the ensuing colloquy failed to provide what the Supreme Court had asked Congress for in *Sable:* "evidence of *how* effective or ineffective" various options for restricting access to minors might prove to be. 109 S.Ct. at 2838. There were neither hearings nor presentations of reports. Senator Helms supported his Amendment with references to the degeneracy of the Roman Empire, *see* Cong.Rec. S15794 (daily ed. Nov. 16, 1989), but failed to provide the concrete findings on different regulatory options that the *Sable* Court mandated.

The Court must look elsewhere than Congress to determine if the government's burden has been satisfied. The FCC Report and Order in regard to the regulations accompanying the bill recognizes that "the addition of a defense [in Section 223(c) ] for [implementing a system of voluntary] blocking would undoubtedly be less burdensome for dial-a-porn providers, but ... it would be insufficient to achieve realistically the goal of the statute: protection of children." Report and Order at 7, ¶ 17 n. 17. The FCC, which did hold hearings before issuing its report, cites three reasons why voluntary blocking would be ineffective: (1) children will still be able to access such messages from other area codes; (2) children will still be able to access such messages from payphones; and (3) a telephone in a home or other location where the blocking option has not been exercised will still be accessible to a child. The first problem can be addressed technologically by telephone companies blocking access from other area codes, a slight change from New York's current blocking of access from out-of-state area codes, and the second problem can be addressed by such companies utilizing New York's re-

striction of access from payphones. *See also Carlin II,* 787 F.2d at 848–49 ("any solution to the dial-a-porn problem would not necessarily be rendered unacceptable merely because it did not cover coin calling" because few minors have enough money to afford coin calling and there is evidence that very few calls to IP's are received from payphones). As to the FCC's third problem, the same risk of a child going over to a friend's house exists under the pre-subscription scheme. The FCC Report and Order is also unpersuasive because it cites little factual basis and makes no findings.[6]

The government contends that despite the lack of evidence in government reports, the evidence presented at the preliminary injunction hearing supports its contention that the statute's options of pre-subscription and independent billing mechanisms embody the least restrictive, effective means.

#### a. Pre-subscription

The government's Post–Trial brief concedes:

> [T]he pre-subscription requirement would put plaintiffs to certain costs [that they do not have to endure under New York's current voluntary blocking scheme]: for example, the costs of producing and distributing simple consent forms that individuals could submit to carriers, the costs of a marketing campaign to encourage pre-subscription, lost investments where their present equipment is incompatible with alternative operating procedures, or even an ultimate loss of some customers. . . .

Gov. Post–Trial Mem. at 56. Thus, the added expense to the plaintiffs which the Helms Amendment will cause is admitted and a loss of customers appears likely.

In the government's survey of households which had used sexually explicit telephone services in the preceding month, more than 70 percent responded that they were not "very likely" to pre-subscribe and

---

**6.** The hearings and FCC testimony discussed in *Sable,* 109 S.Ct. at 2838, pre-date the technologi-cal advances permitting voluntary central blocking.

more than 60% responded that they were not "very likely or somewhat likely" to pre-subscribe.[7] Gov.Ex.L. New York Telephone has projected that implementation of pre-subscription would result in a reduction of over 7,000,000 calls annually. Pl.Ex. 11. And the owner of plaintiff, American Information Enterprises testified that, "the greater majority of people will be put out of business" by the pre-subscription requirement and the resulting reduction in total calls received and billed.[8] Liebowitz Dep. at 84–85.

It is unlikely that pre-subscription would cause the elimination of all of plaintiffs' businesses. The 1989 Pennsylvania pre-subscription requirement, which drove IP's out of business or forced them to change their content, was accompanied by virtually no marketing efforts. However, the evidence does support a finding that pre-subscription would be more restrictive on listeners and IP's than the current voluntary blocking system in place in New York.

### b. Independent Billing and Collection

The government contends that the independent billing alternative is an effective means of pursuing the purpose of the Helms Amendment if billing methods such as pre-subscription, pre-payment or credit-card billing are utilized. The government has presented no evidence that pre-payment would be any less restrictive than pre-subscription. Plaintiffs presented opinion testimony that pre-subscription would be a burden because their customers prefer to call on impulse. The evidentiary value of such statements is questionable, but in any event this same inhibiting factor would be present with pre-payment. *See also*

*Carlin II,* 787 F.2d at 856 n. 7 (noting "chilling effect of a written application and identification procedure").[9]

As for credit card billing, advertisements for IP's currently operating exclusively through credit card sales show that a number of IP's exist through credit card billing. The plaintiffs presented evidence showing that credit card billing is more costly and offered opinion evidence that it would exclude that portion of the public who do not have plastic money.

The Court essentially agrees with the government's expert "that N.Y.Tel. is generally the most profitable billing method available for dial-a-porn companies," Gov. Post–Trial Mem. at 34, and finds that despite the additional cost of independent billing and collection, the IP industry would survive if independent billing were made mandatory.[10] However, the costs of independent billing mechanisms would to some extent reduce the number of IP's, make the unit calls more costly, and to some extent exclude callers.[11]

### c. Voluntary Blocking

Most importantly, the government presents no evidence to contradict the proposition that a properly implemented version of New York's current voluntary blocking system is adequately protective of children and is less restrictive than either a pre-subscription requirement or an independent billing mechanism.

### i. Restrictiveness

In comparison with pre-subscription and independent billing, voluntary blocking enables a greater number of households to

**7.** Even if the government expert is correct that the results of the survey reveal 40 to 50 percent under-reporting, the survey still reveals that there would be a significant inhibition factor resulting from pre-subscription.

**8.** It cannot be ascertained what percentage of calls currently received are stimulated by latent curiosity or are made by practical joke callers. Pre-subscription would undoubtedly reduce such calls.

**9.** There was also testimony from an owner of an IP that he placed an advertisement for a prepay-

ment system and received no response. Liebowitz Dep. at 28. This testimony also has limited evidentiary value.

**10.** IP's would not exist but for the antitrust break-up of AT & T and the consequent availability of telephone lines for commercial use.

**11.** These conclusions are reached despite the fact that the government was able to substantiate that this suit is being financed not by the plaintiffs, but, in large part, by companies that engage in credit card billing.

have access to IP's services and places fewer burdens on the IP's and listeners.

The government contends that voluntary blocking is not necessarily a less restrictive means because it results in a greater burden on the parents who oppose access to IP's services than do other alternatives. However, the government's contention misconstrues the least restrictive means analysis which focuses on limiting the restrictions on the speakers and listeners of protected speech and not on the restrictions on those who wish to limit access to protected speech. Moreover, the Supreme Court and Circuit Courts have made clear that the responsibility for restricting access to protected speech because of an interest in protecting minors traditionally should be placed on the shoulders of parents in our society.[12] *See Ginsberg v. New York*, 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968); *Fabulous Associates, Inc.*, 896 F.2d at 788 (citing *Bolger v. Youngs Drug Products*, 463 U.S. 60, 73–74, 103 S.Ct. 2875, 2883–84, 77 L.Ed.2d 469 (1983) (parental discretion controlling access to unsolicited contraceptive advertisements in the home is the preferred method of dealing with such material)); *see also FCC v. Pacifica Foundation*, 438 U.S. 726, 758, 98 S.Ct. 3026, 3045, 57 L.Ed.2d 1073 (Powell, J., concurring); *cf. Carlin I*, 749 F.2d at 122 & n. 13 (voluntary blocking is " 'analogous to a scheme used by the postal service whereby individuals may request material that they consider "to be erotically arousing or sexually provocative" not be delivered.' ") (quoting FCC Report, 49 Fed. Reg. 24,998–99).

In other media of expression, the government's argument that the burden should be shifted away from the parents and on to the speakers would have more validity. In *Pacifica*, the Supreme Court held that when the means of communicating indecent speech allows an unexpected intrusion into the privacy of the home and is uniquely accessible to children, then indecent speech

receives "limited protection" and the least restrictive means test is not applicable. 438 U.S. at 749–51, 98 S.Ct. at 3040–41. In *Sable*, the Supreme Court held that *Pacifica* does not govern regulation of indecent telephone communications because telephone speech "is not so invasive" as to constitute grounds for abandoning the least restrictive means test. 109 S.Ct. at 2837 (citing *Bolger v. Youngs Drug Products Corp., supra*, as governing rather than *Pacifica*). Accordingly, the Court finds that in the context of IP's utilizing the telephone lines to receive calls, there is a likelihood that the government will not be able to present sufficient evidence at trial to show that a voluntary blocking system, like that of New York, is not less restrictive than the means incorporated in the Helms Amendment.

### ii. Effectiveness

The only remaining issue is whether voluntary blocking is an effective means of satisfying the government's compelling interest. The government relies on the testimony of Dr. Park Dietz, a member of the Attorney General's 1986 Pornography Commission and an expert on forensic psychiatry, as the basis for its contention that voluntary blocking is inadequate. However, Dr. Dietz only testified to the harm caused in three cases of children gaining access to sexually explicit telephone services. Such evidence is not broad enough a sample to constitute a valid social science study. Dr. Dietz also testified that he had read in a newspaper that Pacific Bell Company had received one hundred complaints in a month. Tr. 362. Even if that testimony is considered, the government has not provided the Court with that article, nor was it clear whether the article referred to complaints about the content of the telephone messages or about actual instances of exposure to the messages by children. Most importantly, it was not clear whether the 100 complaints in a month figure refers

---

**12.** Whether this traditional approach to the protection of minors as a parental responsibility takes into account more recent changes of the parental role in today's society—such as the working mother, the single parent, and the children's rights movements—is beyond the scope of this Opinion, but is a problem which must be faced by the executive and legislative branches of government as well as by the judiciary.

to the time period before or after Pacific Bell instituted a voluntary blocking scheme in the summer of 1988. Lastly, the weight which the Court gives Dr. Dietz's 100 complaint figure is somewhat diminished by testimony from Charles Eugene Ryan, Jr., the President of the Information Providers Association of California from 1987 through June 30, 1989, that voluntary blocking greatly reduced the number of complaints and that there were only 100 complaints annually rather than 100 complaints monthly before voluntary blocking went into effect. Tr. 289–93.

The evidence primarily relied upon by the government in support of its argument that voluntary blocking is ineffective is Dr. Dietz's testimony that exposure to certain sexually explicit messages can have an instantaneous negative psychological impact on a child. The government contends that under voluntary blocking, a parent will only protect his or her child when the parent has received a bill reflecting that the child has already obtained access and by that time the child will already have been damaged. Such testimony supports the Court's finding that the government has a compelling interest in protecting minors, but it does not show that more than "a few of the most enterprising and disobedient young people [can or are] manag[ing] to secure access to such [indecent telephone] messages," despite the presence of a voluntary blocking scheme. *Sable*, 109 S.Ct. at 2838.

Moreover, the evidence presented at the preliminary injunction hearing is that New York's voluntary blocking system did not show that minors were obtaining exposure to adult services without their parents' consent. Under New York's voluntary block-ing system, the telephone bill itemizes all calls to IP's so parents can be on notice if children have utilized the telephone to contact a service. However, only 4 percent of New York's 4.6 million households have requested voluntary blocking and no substantial evidence of complaints from parents about the exposure of their children was presented.

The New York Public Service Commission, after conducting hearings and preparing reports, has concluded on five occasions since 1988 that voluntary blocking was a sufficient restriction on IP's to protect minors. Although the Public Service Commission has received complaints, they primarily represent the expected adult opposition to the content of the IP's services and do not document exposure to children.[13]

Senator Helms, this statute's sponsor, stated on the floor of the Congress that this legislation is necessary to stop "countless lives [from] being destroyed." *See* Cong.Rec. S15793 (daily ed. Nov. 16, 1989). However, the Supreme Court obligates the Court not to defer to Congress but to make an independent judgment in this First Amendment context. *Sable*, 109 S.Ct. at 2838. The evidence before the Court shows that there is a likelihood that at trial the government will not be able to meet its "heavy burden of demonstrating," *Carlin I*, 749 F.2d at 121, that a voluntary blocking system, as currently technologically available, is an ineffective means of protecting minors.[14] Accordingly, there is a likelihood that the Helms Amendment will be found to violate the First Amendment insofar as the means it utilizes to restrict speech are not the least restrictive means for effecting a compelling government interest.[15]

---

**13.** In addition, James Favole, the owner of an IP which receives hundreds of thousands of New York calls per month, testified that he has informed the [New York] telephone company that "anytime there is a complaint, they [the telephone company] can address it to me." Tr. 56. But Mr. Favole has only received two complaints, Tr. 56.

**14.** The Court notes that there appears to be room for improvement in the promotion of New York's voluntary blocking system to increase the public awareness of its availability.

**15.** The least restrictive option is not necessarily constitutional if the burden it imposes on free speech outweighs the benefits to the government's compelling interest. *Carlin I*, 749 F.2d at 121. The Court does not reach the issue of whether voluntary blocking satisfies that balancing test.

In addition, the findings are subject to change in light of future economic and technological developments.

### B. *Vagueness*

█ Turning from the statute's procedural mechanisms for accomplishing its goals to the meaning of the statute's substantive terminology, "[i]t is a basic principle that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). Plaintiffs contend that the use of the term "indecent" violates the vagueness doctrine's requirements that a statutory term not cause "men of common intelligence ... necessarily [to] guess at its meaning and differ as to its application." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).[16]

The Supreme Court requires varying degrees of certainty in statutory terms. The Helms Amendment is subject to the most strict vagueness test because it imposes both civil penalties with a prohibitory effect and criminal penalties and because it reaches constitutionally protected speech. *See Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193–94, 71 L.Ed.2d 362 (1982); *Smith v. Goguen*, 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974). Although, the most stringent vagueness test does not "expect mathematical certainty from our language," *Grayned*, 408 U.S. at 110, 92 S.Ct. at 2300; the statute's terminology must be sufficient so that (1) plaintiffs have fair warning as to what conduct is prohibited, *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972); (2) the law cannot be enforced arbitrarily or discriminatorily, *Grayned*, 408 U.S. at 108–09, 92 S.Ct. at 2298–99; and (3) speakers or IP's are not deterred from engaging in protected speech not subject to the Helms Amendment. *Id.* at 109, 92 S.Ct. at 2299.

The term "indecent" unto itself is highly ambiguous. A California court surveyed the history of the term in state courts and dictionaries, and produced an impressive array of adjectives and descriptions. *See In re Davis*, 242 Cal.App.2d 645, 51 Cal. Rptr. 702, 711–12 (1966) (citations omitted) (holding criminal statute void for vagueness); *see also State v. Kraft*, 214 La. 351, 37 So.2d 815, 817 (1948) (same).

However, courts can look beyond the dictionary definition of a statutory term for a definition. The most appropriate places for a specification of what Congress intended are the context in which the term appears in the code and in the FCC regulations. Although the regulations do not address this issue, the statutory context provides some help. Section 223(b)(1) restricts "obscene communication," so it is clear that in Section 223(b)(2) Congress intended "indecent" to mean something different than "obscene."

"Obscene" means that: (1) the average person, applying contemporary community standards, would find that the speech taken as a whole, appeals to the prurient interest; (2) measured by contemporary community standards, the speech depicts or describes, in a patently offensive way, *sexual conduct specifically defined* by the applicable state law; and (3) the speech, taken as a whole, lacks serious literary, artistic, political, or scientific value. *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973). The *Miller* definition of obscenity has been upheld against vagueness challenges because it requires the incorporation of laws which "specifically define" the applicable expressive activity and thereby "provide fair notice to a dealer in such materials." 413 U.S. at 24, 27, 93 S.Ct. at 2614, 2616. The *Miller* Court also provided examples of specific definitions of proscribed conduct: "patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated" and "patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of genitals." 413 U.S. at 25, 93 S.Ct. at 2615.

---

**16.** The *Sable* Court upheld the power of Congress to regulate indecent telephone communications. *109 S.Ct. at 2836.* The issue addressed herein is the separate issue of the meaning of indecent telephone speech, an issue not directly addressed by the *Sable* Court.

Then in *Hamling v. United States*, 418 U.S. 87, 114–16, 94 S.Ct. 2887, 2906–07, 41 L.Ed.2d 590 (1974), the Supreme Court "for the first time" held that the mere reference in a statute to an "obscene" "article, matter, thing, device or substance" is not vague because the term "obscene" had acquired a definition "limited to the sort of 'patently offensive representations or depictions of that specific "hard core" sexual conduct given as examples in *Miller v. California.*' " *Osborne*, — U.S. at — —, 110 S.Ct. at 1169–1700. *See also Hamling*, 418 U.S. at 115, 94 S.Ct. at 2906 ("*United States v. 12,200–ft. Reels of Film*, [413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973),] made clear our willingness to construe federal statutes dealing with obscenity to be limited to material such as that described in *Miller.*"). The same principle would require a court to deny a vagueness challenge to the term "obscene" in Section 223(b)(1) of the Helms Amendment. *See Sable*, 109 S.Ct. at 2835–36 (upholding constitutionality of Section 223(b)(1)'s regulation of obscene telephone speech) (citing *Hamling, supra,* and *United States v. 12,-200–ft. Reels of Film, supra*).

However, this challenge is to the use of the term "indecent." In the past, courts have resolved challenges to the vagueness of the term "indecent" by construing it to mean "obscene." *See, e.g., Hamling, supra; Carlin III*, 837 F.2d at 558–60; *see also Osborne*, 110 S.Ct. at 1697 n. 7 (Brennan, J., dissenting) (reviewing cases in which "courts found it necessary to equate 'lewd' [and 'indecent'] with 'obscene' in order to avoid overbreadth and vagueness problems."); *Pacifica*, 438 U.S. at 740, 98 S.Ct. at 3035 (explaining Supreme Court's construction of term "indecent" to mean "obscene" in *Hamling, supra; United States v. 12,200–ft. Reels of Film*, 413 U.S. at 130 n. 7, 93 S.Ct. at 2670 n. 7; and *Manual Enterprises, Inc. v. Day*, 370 U.S. 478, 482–83, 82 S.Ct. 1432, 1434–35, 8 L.Ed.2d 639 (1962) (Opinion of Harlan, J.)). The implication of those holdings which construe "indecent" to mean "obscene" is that if the term "indecent" had not been susceptible to such a limiting construction then there would have been "constitutional

problems." *Carlin III*, 837 F.2d at 558. The statute at issue here is not susceptible to such a limiting construction, because the Helms Amendment restricts "indecent communications" in a separate section than "obscene communications." *See* 47 U.S.C. §§ 223(b)(1) and 223(b)(2).

The government argues that even though "indecent" cannot be construed to mean "obscene," the term "indecent" is adequate under recent Supreme Court cases denying vagueness and overbreadth challenges to laws regulating speech which falls "short of obscenity." Gov.Post–Trial Mem. at 58. The statutes at issue in those cases, however, did not involve the mere use of the term "indecent."

In *New York v. Ferber*, there was an overbreadth challenge to the statutory terms " 'actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals.' " 458 U.S. 747, 765, 773–74, 102 S.Ct. 3348, 3358, 3363–64, 73 L.Ed.2d 1113 (1982). Those terms all contain a "precision," *id.* at 765, 102 S.Ct. at 3358, which the term "indecent" lacks. Indeed, the Supreme Court noted that the statutory terms were of "sufficient precision" to be one of the examples of sexual conduct which the *Miller* Court had denominated obscene. 458 U.S. at 765, 102 S.Ct. at 3358 (citing *Miller*, 413 U.S. at 25, 93 S.Ct. at 2615). *See supra* (quoting the examples of "sexual conduct specifically defined by" law incorporated within the *Miller* definition of obscenity, 413 U.S. at 25, 93 S.Ct. at 2615).

Similarly, in *Osborne, supra*, the Supreme Court deferred to a state court's construction of a state law, slip op. at 15, and held that the terminology of the state's prohibition on expression, as set forth by the state court, was sufficiently exact to withstand constitutional scrutiny. The state court terminology was: " 'the possession or viewing of material or performance of a minor who is in a state of nudity, where such nudity constitutes a lewd exhibition or involves a graphic focus on the genitals, and where the person depicted is neither the child nor the ward of the person

charged.'" *Osborne*, —— U.S. at ——, 110 S.Ct. at 1697 (quoting Ohio Supreme Court).[17]

The government also relies on the denial of a vagueness challenge in *Young v. American Mini Theatres*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). The statute in *Young* defined the terms "specified sexual activities" and "specified anatomical areas" with an extensive list. 427 U.S. at 53 n. 4, 96 S.Ct. at 2444 n. 4. Moreover, the *Young* Court did not consider the validity of the plaintiffs' vagueness claims because there was no issue as to whether the statute applied to the expressive activity of the plaintiffs. *Id.* at 58–59, 96 S.Ct. at 2446–2447.

Here, plaintiffs actively question whether the term "indecent" encompasses any of their speech and, if it does, plaintiffs question which characteristics of their speech are determinative of whether or not the speech falls within the scope of the term "indecent." There was testimony that the speech of IP's comes in live and taped formats, and the contents include verbal re-creations of masturbation, male and female homoeroticism, "the erotic application of an enema," simulated rape, anal intercourse, sadomasochism, anilingus, group sex, vaginal intercourse, fellatio, sucking and biting, passive and aggressive responses, as well as digital, phallic and foreign object penetration.[18] Gov.Ex.T.

The word "indecent" in the Helms Amendment will satisfy the due process goals of the vagueness doctrine, *see supra*, if it is possible to find an inherent and specific meaning to the term "indecent communications for commercial purposes" "by means of telephone," as it was possible to find an inherent and specific meaning for the term "obscene" in *Hamling v.*

United States, supra.* In *Hamling*, the Supreme Court held that the term "obscene" was not vague because the *Miller* decision had "enumerat[ed] specific categories of material" as obscene. 418 U.S. at 116, 94 S.Ct. at 2907. The government argues that *Pacifica, supra,* similarly set forth a precise definition of "indecent" which must be utilized in this statute. *See also* Report and Order at 6, ¶ 12 (assuming that *Pacifica* definition of "indecent" is what courts will find "indecent" to mean in Helms Amendment).

In *Pacifica*, the Supreme Court, in a 5–4 decision, reviewed whether the definition of "indecent" set forth by the FCC, with regard to the regulation of radio broadcasts, was impermissibly vague or overbroad. In the FCC opinion under review, the FCC had determined that in the specific factual context at issue, "indecent" meant:

'language that describes, in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities and organs.'

438 U.S. at 732, 98 S.Ct. at 3031 (quoting 56 F.C.C. 94, 98 (Feb. 21, 1975)). Justice Stevens, wrote for the Court that even though "indecent" on its own "merely refers to nonconformance with accepted standards of morality," 438 U.S. at 740, 98 S.Ct. at 3035, the FCC definition was constitutionally adequate because it "will deter only the broadcasting of patently offensive references to excretory and sexual organs and activities." 438 U.S. at 743, 98 S.Ct. at 3037. *See Action for Children's Television v. FCC*, 852 F.2d 1332, 1339 (D.C. Cir.1988) [hereinafter *Act* ] ("if acceptance of the FCC's generic definition of 'indecent' as capable of surviving a vagueness challenge is not implicit in *Pacifica*, we have

---

**17.** The statutory language in *Osborne* was also significantly more precise than here: " 'minor in a state of nudity.' " —— U.S. at ——, 110 S.Ct. at 1694.

**18.** The verbal depictions of these acts may well constitute obscenity under *Miller*.

   The government's position at trial and the FCC's position in its Report and Order is that health-related discussions of AIDS are not considered to be indecent.

The government's position at trial was that live commercial telephone communications, for example the gay oriented lines in existence on New York's 550 prefix, would not be subject to the statute's restrictions because the speech would not be "communications for commercial purposes." However, the FCC states in its Report and Order that the statute does cover live commercial conversations.

misunderstood Higher Authority and welcome correction").

Although the *Pacifica* definition of "indecency" has been referred to as "a generic definition of indecency," *see ACT*, 852 F.2d at 1337, courts and the FCC have repeatedly emphasized that the applicability of the FCC's generic *Pacifica* definition of "indecent" is limited to a specific radio broadcasting context. The Supreme Court made clear the narrowness of its holding by stating that the *Pacifica* definition of "indecency" was not necessarily applicable to "a two-way radio conversation," *Pacifica*, 438 U.S. at 750, 98 S.Ct. at 3041; television and "closed circuit transmissions," *Ibid.;* or mail. *Bolger*, 463 U.S. at 74, 103 S.Ct. at 2884. The FCC also declined even to expand the definition into the realms of news and public affairs programming. *ACT*, 852 F.2d at 1337. In 1987, the FCC finally expanded the *Pacifica* definition of indecency to cover all radio broadcasts, but that was only after "a Public Notice alerting all broadcasters to the new, generic standard by which broadcasts would be judged." *ACT*, 852 F.2d at 1337 (citing *New Indecency Enforcement Standards to be Applied to All Broadcast and Amateur Radio Licensees*, 64 Rad.Reg.2d (P & F) 1218, 1218–19 (1987)).[19]

The reasoning behind the "narrowness," 438 U.S. at 750, 98 S.Ct. at 3041, of the applicability of *Pacifica's* definition of "indecency" is the nature of indecency. The *Pacifica* Court explained that indecency is derived from the concept of nuisance, " 'a right thing in the wrong place—like a pig in the parlor instead of a barnyard.' " 438 U.S. at 750, 98 S.Ct. at 3041 (quoting *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 388, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926)). In this respect, indecency is different than obscenity, which does not lose its character depending on the context or medium of expression used. Each different parlor creates different "indecent" pigs or, as Justice Stevens wrote for the *Pacifica* Court,

"each medium of expression presents special First Amendment problems. .... The reasons for these distinctions are complex." 438 U.S. at 748, 98 S.Ct. at 3039–40. Consequently, "indecency is largely a function of context—it cannot be adequately judged in the abstract." 438 U.S. at 742, 98 S.Ct. at 3037.

Here, the government asks the court to assume that the *Pacifica* definition is to be carried over into the realm of telephone communication, despite the absence of any rule, regulation or statutory language indicating that the *Pacifica* definition has somehow been incorporated into the Helms Amendment. Precedent directs against the government's proposed transplant of the *Pacifica* definition. In *Sable*, the Supreme Court held that *Miller* standards governed the obscenity portion of the statutory regulation of telephone communications, 109 S.Ct. at 2835–36 (citing *Hamling, supra,* and *United States v. 12,200–ft. Reels of Film, supra* ); but that *Pacifica* was not applicable to the indecency portion of the telephone communications statute. Justice White, writing for the *Sable* Court, held *Pacifica* to be "readily distinguishable" because the radio medium in *Pacifica* was "manifestly different from" the medium of telephone communications. 109 S.Ct. at 2837. The "uniquely pervasive" character of the radio broadcasting medium in *Pacifica* created a "captive audience" context from which "indecency" emerged in *Pacifica* under a nuisance theory. *See Sable*, 109 S.Ct. at 2837; *Pacifica*, 438 U.S. at 748–50, 98 S.Ct. at 3039–40. The telephone medium at issue here has been held by the Supreme Court to be "substantially different" than the *Pacifica* radio medium, because the telephone medium lacks radio broadcasting's "invasive" and "captive audience" characteristics. *Sable*, 109 S.Ct. at 2837; *Carlin III*, 837 F.2d at 560 ("telephone calls made by an individual over a private line differ significantly from the public broadcast in *Pacifica* "). It is not

---

**19.** Although the word "Television" appears in the name of the lead plaintiff in the *ACT* case, the case was only about the regulation of radio broadcasting and made no reference to the extension of the *Pacifica* generic definition of "in-

decent" outside of the realm of radio broadcasting. The *ACT* decision followed *Pacifica* and upheld *Pacifica's* "radio broadcasting" definition of "indecent" against a vagueness challenge. 852 F.2d at 1338–39.

even clear if it is possible for *Pacifica*-type "indecency" to emerge from a medium of communication, such as the telephone, which lacks the intrusive "captive audience" characteristic that formed the basis for the existence of the nuisance of indecency in the medium in *Pacifica. See Cruz v. Ferre,* 755 F.2d 1415 (11th Cir.1985) (striking down regulation of indecent content of cable television broadcasts because of differences between cable television medium and radio broadcasting in *Pacifica* ); *Community Television v. Wilkinson,* 611 F.Supp. 1099 (D.C.Utah 1985) (same), aff'd sub nom., *Jones v. Wilkinson,* 800 F.2d 989 (10th Cir.1986), aff'd, 480 U.S. 926, 107 S.Ct. 1559, 94 L.Ed.2d 753 (1987). In light of the differences between media of communication, the Court finds that it cannot be assumed that the *Pacifica* definition of "indecent" applies here.[20]

Without any additional specificity, the term "indecency" on its own is too vague to pass constitutional muster. The term indecency does not inherently contain within it a reference to specifically defined conduct, as does the term "obscenity." *See Hamling, supra.* Moreover, the term does not appear in the context of a specific definition of conduct, as was the case with the terms in *Pacifica, supra; Ferber, supra;* and *Osborne, supra.* The statute and regulations only make a person of common intelligence aware that "offensive" communications are to be restricted. There must be notice of what constitutes such indecency or offensiveness, or else: there is not fair notice of what is restricted; the statute can be arbitrarily enforced; and protected expression could be deterred. Accordingly, based on the record currently before this Court, there is a likelihood that plaintiffs will be able to prove that Section 223(b)(2) is void for vagueness.

## C. *Prior Restraint*

■ The dangers to First Amendment freedoms presented by vagueness are compounded if the statute also operates by means of an unconstitutional prior restraint. *Interstate Circuit v. City of Dallas,* 390 U.S. 676, 682, 88 S.Ct. 1298, 1302, 20 L.Ed.2d 225 (1968). Constitutional principles of free speech and due process prohibit the government from placing prior restraints on protected speech without appropriate procedural safeguards. *See Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). The threshold issue is whether the statute is structured so as to create a prior restraint. A brief review of the planned operation of the Helms Amendment is necessary to resolve that issue.

■ Section 223(c)(1) requires common carriers to categorize, as either indecent or decent, the content of speech made by IP's that use a carrier's billing systems.[21] Accordingly, Section 223(c)(1)'s mandate that the carrier "shall not, to the extent technologically feasible provide access" to the IP's "indecent" telephone services will be applicable to all IP's currently using the carrier's billing system, unless the IP switches to an independent billing system or complies with a system of pre-subscription. The carrier may, however, continue to bill, as at present, for "decent" IP services. The effect of Section 223(c)(1) is that carriers will have to evaluate the speech of the IP and require IP's utilizing indecent speech to utilize pre-subscription or an independent billing mechanism.[22]

---

**20.** In addition, the Helms Amendment imposes criminal penalties, while only the threat of a civil sanction was at stake in *Pacifica.*

**21.** The evidence is that the vast majority of IP's in operation currently use carrier billing. In New York, independent billing has only been an option available to IP's since May 1990.

**22.** Section 223(c)(2)(A) further promotes the active role of the carrier in classifying and imposing pre-conditions on IP's' "indecent" telephone speech by granting the carrier "good faith" immunity from any cause of action brought

against the carrier in response to the carrier's having "restrict[ed] access" to speech it had predetermined to be "indecent."

The sole exception to Section 223(c)(2)(A) is an IP's declaratory judgment action "limited to the question of whether the communications which the provider seeks to provide fall within the category of communications to which the carrier will provide access only to subscribers who have previously requested such access." 47 U.S.C. § 223(c)(3).

The statute also provides a carrier with immunity for *failing* to restrict indecent speech, *see* 47

The government argues that a carrier's classification and imposition of such conditions to carrying telephone communications is not a prior restraint but a subsequent punishment. However, Section 223(c)(1)'s requirement that a carrier prevent access to an indecent communication calls for the carriers to impose restrictions on an IP's communication *before* that communication has been expressed. By contrast, Section 223(b)(2)'s subjection of IP's and carriers to penalties for the communication of indecent speech is a punishment *subsequent* to the expression of the indecent speech.[23] Section 223(c)(1) makes no reference to speech already communicated. The sole function of Section 223(c)(1) is to have certain conditions placed on speech that is to be communicated in the future and to have those conditions put in place before that speech is communicated. Accordingly, Section 223(c)(1) requires action "prior" to communication.

The prior action of the carriers also constitutes a "restraint" on protected speech. The effect of Section 223(c)(1)'s requirement, that a carrier make a determination that an IP's speech is indecent and impose a system of pre-subscription or independent billing, is to restrict the future communication of that speech. A restriction on speech need not effect a ban on that speech to constitute a prior restraint. *See Southeastern*, 420 U.S. at 556–57 & n. 8, 95 S.Ct. at 1245 & n. 8 (denial, based on content of play, of use of municipal auditorium was a prior restraint "even if a privately owned forum had been available") (citing *Schneider v. State*, 308 U.S. 147, 163, 60 S.Ct. 146, 151–52, 84 L.Ed. 155 (1939) ("one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place")); *Interstate Circuit v. Dallas, supra* (prior restraint results from government authorized board which classifies film as "not suitable for young persons," even though film is not banned by that classification); *Grosjean v. American Press Co.*, 297 U.S. 233, 244–45, 56 S.Ct. 444, 447, 80 L.Ed. 660 (1936) (statute imposing tax on newspapers with high circulation is a prior restraint because "its direct tendency is to restrict circulation").

The government argues, however, that any prior restrictions imposed on speech by the carriers cannot be unconstitutional because the prior restraints are the product of a private determination, rather than government action. It is undisputed that common carriers are private entities and that there is no constitutional problem raised by a common carrier independently deciding that it would rather not facilitate the communication of indecent speech. *See Sable*, 109 S.Ct. at 2840 (Scalia, J., concurring); *Mountain States Telephone and Telegraph Company*, 827 F.2d 1291, 1295 (9th Cir.1987) [hereinafter *Mountain States*] (citing *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350–54, 95 S.Ct. 449, 453–55, 42 L.Ed.2d 477 (1974) (public utilities are not state actors)), cert. denied, 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988); *Carlin Communications, Inc. v. Southern Bell Telephone and Telegraph Co.*, 802 F.2d 1352, 1357 (11th Cir.1986) [hereinafter *Southern Bell*] (same). The issue is whether the statute sets up a structure so that the acts of a common carrier in restricting indecent speech by IP's will be "fairly attributable to" the federal government. *Cf. Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102

U.S.C. § 223(c)(2)(B); however, this immunity is insufficient to relieve the carrier from its role of actively classifying and imposing pre-conditions on the communication of indecent telephone speech. Section 223(c)(2)(B) immunity is premised on "good faith" reliance on an IP's representation that its communications are not indecent. A carrier can be put on notice, through a petition or complaint, that the IP's representation of a lack of indecency is incorrect. After such notice, the carrier will be obligated to undertake an independent examination before it can allow unrestricted access to future communications of the IP based on a "good faith" belief in the correctness of the IP's representation of a lack of indecency.

23. The FCC actions upheld in *Pacifica, supra,* and the obscenity statute upheld in *Sable, supra,* involved post-dissemination penalties. In *Pacifica,* the FCC had threatened to penalize the plaintiff for speech that had already been broadcast; and in *Sable,* the statute called for penalties for those who knowingly had made obscene telephone communications in the past.

S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982) (defining "state action").

At least in New York State, the decision of a carrier to impose restrictions required by the Helms Amendment will be attributable to the federal statutory scheme and not an independent decision. New York Public Service Commission Rule 605.2(b) states:

> No telephone corporation operating as a common carrier shall unreasonably restrict lawful network. No restriction may impede access between a content service provider and a willing customer, except where required by law. All restrictions shall be administered in a least restrictive fashion.
>
> 1. Requirements by telephone corporations on users for prior subscription to a particular content services will generally be permissible only where requested by the provider of the service, or required by law, or where a waiver is granted.
>
> 2. End-user initiated blocking shall always be available for content services, to the extent technically and economically feasible.

In effect, the New York Public Service Commission rules prohibit a telephone carrier in New York from imposing a system of pre-subscription or independent billing, unless the government acts by passing a law requiring such restrictions. *See* Taratus Aff. at ¶ 22. Accordingly, any decision by a carrier in New York to restrict indecent telephone speech through imposing pre-subscription or independent billing will be the products of the Helms Amendment and therefore are attributable to that statute and not private action. *Compare Peterson v. City of Greenville*, 373 U.S. 244, 248, 83 S.Ct. 1119, 1121, 10 L.Ed.2d 323 (1963) (restauranteur's racial segregation of his restaurant in city where there is an ordinance requiring segregation of customers is state action "even assuming, as

respondent contends, that the manager would have acted as he did independently of the existence of the ordinance"), *and Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67–70, 83 S.Ct. 631, 637–39, 9 L.Ed.2d 584 (1963) (book distributor's decision not to sell those books which a state commission had classified as "objectionable" was a product of state action, even though distributor was " 'free' to ignore the Commission's notices, in the sense that his refusal to 'cooperate' would have violated no law," because "[t]he Commission's operation is a form of effective state regulation"), *with Mountain States*, 827 F.2d at 1297 (carrier's ban on IP's sexually explicit speech was a product of independent business judgment because carrier was "free" to extend service to IP and "immunize[d] from state pressure" to restrict IP's access), *and Southern Bell*, 802 F.2d at 1361 ("only reasonable inference that can be drawn from the record in this case is that the operative decisions [to restrict access to an IP] ... were made by Southern Bell [the carrier]").

■ The finding that the statute creates a system of prior restraint does not render the statute unconstitutional *per se;* however, that finding does create " 'a heavy presumption against its [the statute's] constitutional validity.' " *FW/PBS, Inc. v. City of Dallas*, —— U.S. ——, 110 S.Ct. 596, 604, 107 L.Ed.2d 603 (1990) (quoting *Southeastern Promotions, Ltd.*, 420 U.S. at 558, 95 S.Ct. at 1246). The Supreme Court has set forth "rigorous procedural safeguards" which must be satisfied for a prior restraint to withstand constitutional scrutiny.[24] *Southeastern Promotions, Ltd.*, 420 U.S. at 561, 95 S.Ct. at 1248. The purpose of these safeguards is to protect against the "danger that he [the party restraining speech prior to its expression] may well be less responsive than a court—part of an independent branch of government—to the

---

**24.** The government does not argue here that indecent telephone communication is one of the established exceptions to the doctrine of prior restraint. *See Southeastern Promotions, Ltd.*, 420 U.S. at 555–56, 95 S.Ct. at 1244–45 (listing exceptions, such as when there is a "captive audience" problem). Since this is a content-based restriction of speech, the exception for "time, place, and manner" regulations does not apply here either. *See FW/PBS, Inc.*, 110 S.Ct. at 614–15 (White, J., dissenting); *Southeastern Promotions, Inc.*, 420 U.S. at 555, 95 S.Ct. at 1244.

constitutionally protected interests in free expression." *Freedman v. Maryland,* 380 U.S. 51, 57–58, 85 S.Ct. 734, 738, 13 L.Ed.2d 649 (1965).

■ The three procedural safeguards which the Supreme Court has held to be necessary to guard against a prior restraint are:

> (1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court.

*FW/PBS, Inc.,* 110 S.Ct. at 606 (citing *Freedman,* 380 U.S. at 58–60, 85 S.Ct. at 738–39). The statute fails to provide any of, what have come to be known as, the three *Freedman* safeguards.

The first *Freedman* safeguard is intended to limit the effect of the restraints imposed as a result of a carrier's determination through the specification of a limit on the length of time for which a carrier's determination can be in effect prior to judicial review. The first safeguard is not present, because the statute does not limit the time period prior to judicial review during which the carrier's determination, that communications will be indecent, will be in effect.

The second and third safeguards are not satisfied here, because the only provision for judicial review of the carrier's determination is Section 223(c)(3). That Section provides neither for expedited judicial review, for the carrier to bear the burden of going to court, nor for the carrier to bear the burden of proof at trial. Section 223(c)(3) only provides for the IP to bring a declaratory judgment action.

The right to bring a declaratory judgment action is essentially the same as the right of the theatrical promoter in *Southeastern* to bring an action seeking an injunction against the municipal auditorium's imposition of restrictions on his play on the grounds that the municipal auditorium had incorrectly characterized his play's content as obscene. In *Southeastern,* the Supreme Court pointed out that a final determination on the merits of whether the play was obscene took a few months, 420 U.S. at 562, 95 S.Ct. at 1248, which was not a sufficiently expeditious period because the dates on which the promoter had planned to present his play without any restraints had passed by the time the court's final determination was made. *Ibid.* Since there was evidence that IP's change their pre-recorded messages frequently, the Section 223(c)(3) declaratory judgment action is not expeditious judicial review. It appears likely that an IP would be forced to subject its speech to the restrictions of pre-subscription or independent billing before that IP would receive a final determination on the merits of a declaratory judgment action under Section 223(c)(3). In addition, Section 223(c)(3) on its face fails to meet the requirement that the carrier bear the burden of going to court and of proving that the basis for the restraint is a correct classification of indecency.[25]

Section 223(c) of the Helms Amendment does not incorporate safeguards required by the Supreme Court to obviate the dangers inherent in a system of prior restraint of protected speech. Accordingly, there is a likelihood that plaintiffs will prevail on

---

**25.** In *FW/PBS, Inc.,* three Justices of the Supreme Court held that the third *Freedman* safeguard—that the censor bear the burden of going to court and bear the burden of proof once in court—need not be met in that case for the following reasons: (1) because the censor in that case only made a "ministerial" determination on whether or not to grant a license and did not make an explicit judgment based on the content of any protected speech, and (2) because the licensing applicants had their entire livelihoods at stake so they would undoubtedly undertake the burden of going to court to challenge the decision to impose the restraint. 110 S.Ct. at 607 (Opinion of O'Connor, J.). Those justifications for not requiring that the third safeguard be satisfied are not present here. The statute requires the carriers to pass judgment directly on the content of protected speech. Moreover, there is evidence that many IP's can survive profitably, despite a classification of indecent by the carrier, by subjecting themselves to the pre-conditions of Section 223(c)(1).

their claim that the Helms Amendment contains an unconstitutional prior restraint.

### Conclusion

There is a likelihood that plaintiffs will succeed on the merits of their claims that the Helms Amendment (1) violates the First Amendment by failing to employ the least restrictive means to effect a compelling government interest, (2) violates the First and Fifth Amendments under the void for vagueness doctrine, and (3) violates the First and Fifth Amendments by containing a prior restraint unaccompanied by adequate procedural safeguards. Thus the enforcement of the Helms Amendment presents a threat of imminent irreparable harm to First Amendment freedoms. Plaintiffs' motion for a preliminary injunction is granted.

Plaintffs are to submit a preliminary injunction for signature by the Court on five days notice to the defendant. Counsel are to appear at a conference at 9:00 A.M. on August 29, 1990.

IT IS SO ORDERED.